**EQUALITY FOUNDATION OF. GREATER CINCINNATI, INC. et al., Plaintiffs,**

v.

**The CITY OF CINCINNATI, Defendant.**

No. C–1–93–773.

United States District Court, S.D. Ohio, W.D.

Nov. 19, 1993.

Alphonse Adam Gerhardstein, Scott T. Greenwood, ACLU of Ohio Foundation Inc., Cincinnati, OH, for plaintiffs.

Karl Paul Kadon, Cincinnati, OH, for defendant.

### ORDER GRANTING. PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

SPIEGEL, District Judge.

This matter is before the Court on the Plaintiffs' Motion for Preliminary Injunction (doc. 2), the Defendant's Memorandum in Opposition (doc. 5), the Plaintiffs' Reply Memorandum (doc. 7), the Plaintiffs' Proposed Findings of Fact and Conclusions of Law (doc. 9), Brief of *Amicus Curiae* of Ohio Human Rights Bar (doc. 12), the Defendant's Proposed Findings of Fact and Conclusions of Law (doc. 13), Brief of *Amici Curiae* Ohio Sociological Foundation (doc. 14), and the Plaintiffs' Supplemental Reply (doc. 15). A hearing was held on this matter on November 15, 1993.

### INTRODUCTION

We announced on November 16, 1993, our intention of granting the Plaintiffs' Motion for Preliminary Injunction. We emphasize that we are sensitive to the concerns of the people who voted in favor of the passage of

the Issue 3 Amendment. It is of paramount concern to the Court that all affected by this Order have an understanding of the role of the Court in this case. The Court is in no way granting special rights to any individual or group, nor is it usurping the democratic process. On the contrary, an essential principal of our system of government is that fundamental constitutional rights are not subject to popular vote. Thus, it is one of the most important roles of the federal courts to ensure that the constitutional rights of the few or the powerless are not infringed because their views are unpopular with the majority. Without these principals, and without the independence of the federal courts to preserve them, ours would not be a democracy at all but rather a tyranny at the whim of the majority.

## PROCEDURAL BACKGROUND

The Plaintiffs in this case have filed a motion seeking a preliminary injunction prohibiting the implementation of the Issue 3 Amendment to the Cincinnati City Charter. Accordingly, we will analyze the issues before the Court under the appropriate four part test discussed below.

## FACTUAL BACKGROUND

This action challenges the constitutionality of Article XII of the Cincinnati City Charter, passed by the voters on November 2, 1993. The Plaintiffs allege that the amendment violates their rights of equal protection, free speech, and redress of grievances guaranteed by the First and Fourteenth Amendments to the United States Constitution and by the Constitution of the State of Ohio.

The amendment, titled Issue 3 on the ballot ("Issue 3" or the "Issue 3 Amendment"), provides:

### ARTICLE XII

NO SPECIAL CLASS STATUS MAY BE GRANTED BASED UPON SEXUAL ORIENTATION, CONDUCT OR RELATIONSHIPS

The City of Cincinnati and its various Boards and Commissions may not enact, adopt, enforce or administer any ordinance, regulation, rule or policy which provides that homosexual, lesbian, or bisexual orientation, status, conduct, or relationship constitutes, entitles, or otherwise provides a person with the basis to have any claim of minority or protected status, quota preference or other preferential treatment. This provision of the City Charter shall in all respects be self-executing. Any ordinance, regulation, rule or policy enacted before this amendment is adopted that violates the foregoing prohibition shall be null and void and of no force or effect.

The Charter of the City of Cincinnati is akin to a local constitution. It is the primary governance document in the city. Generally, local laws must comply with the Charter. Policy in the Cincinnati City Government is set by a nine member City Council which is elected at large every two years; the council candidate receiving the highest vote is also elected Mayor.

Guy Guckenberger was a Republican council member for over twenty years. He left the Council in February, 1992 to assume a position as a Hamilton County Commissioner. Mr. Guckenberger testified for the Plaintiffs at the hearing and the Court found him to be a credible and informative witness. He explained that City Council not only passes laws but also does a great deal of constituent work, assisting citizens in their efforts to have particular problems addressed by the City administration. While the day-to-day administration of the City government is left to a professional city manager, the City Council enacts ordinances and sets policy for the city manager and City administration and also has the responsibility and authority to hire and fire the manager.

Mr. Guckenberger explained that council members have many particular constituencies within the Cincinnati electorate such as environmental groups, the AFL–CIO, and Stonewall—a political advocacy group for lesbians and gays. The determination of the competing needs and demands of various groups is accomplished by private meetings with citizens as well as through special public hearings and through the weekly council committee meetings.

Mr. Guckenberger and plaintiff Richard Buchanan, also a credible witness, traced the political development of the gay citizens of Cincinnati. In 1983, Stonewall Cincinnati first endorsed City Council candidates, although many of the candidates refused to accept the endorsement.

Over the years, the gay and lesbian issues pursued through City Council Members included alleged harassment of gays by police in the City Parks, a dispute with the Civil Service Commission regarding the questions on sexual orientation and sexual history for police and fire recruits, and the City EEO ordinance and what eventually became the Human Rights Ordinance.

Mr. Guckenberger noted that although the gay and lesbian political voice was getting stronger over the last decade, many individuals would nonetheless introduce themselves at gay functions by first name only and otherwise indicate that they were not yet ready to declare themselves openly gay.

The Plaintiffs also provided testimony to the effect that the political history of lesbians, gays and bisexuals in Cincinnati is an indication that they are an identifiable group. For example, George Chauncey, an historian at the University of Chicago, stated in his affidavit that there is a well-documented history of discrimination in the United States against gay men, lesbians and bisexuals as a result of their sexual orientation. This discrimination has included status- or identity-based discrimination as well as conduct-based discrimination. Many laws have been passed that have been specifically targeted at and/or selectively enforced against gay men, lesbians and bisexuals.

Furthermore, we found credible the testimony of Plaintiff Roger Asterino who testified at the hearing. He, along with Plaintiff Edwin Greene who testified via affidavit, related their experiences as gay men. Rita Mathis, another credible witness who also testified at the hearing, told of her experience as a lesbian. The testimony of these witnesses included accounts of the discrimination they have experienced because of their sexual orientation. According to their testimony, they experience, among other things, fear of rejection by family and friends, fear of reprisal and violence and harassment in housing and employment.

Dr. Gonsiorek, a highly credentialed psychologist, testified credibly that the experiences of these plaintiffs were typical of the experiences of discrimination of lesbians, gay men and bisexuals. Dr. Gonsiorek showed that lesbians, gay men and bisexuals are an identifiable class because of their shared sexual orientation toward people of the same gender and their shared history of discrimination on the basis of their sexual orientation.

Plaintiff Mr. Asterino, who is 42, testified that he knew by an early age that he was gay and that he prayed to change. He was reluctant to "come out" to his family and co-workers and "came out" only this year to fight alleged sexual orientation discrimination at his job. Similarly, Plaintiff Ms. Mathis described her experience of discrimination as an African–American lesbian mother. Ms. Mathis cited instances of sexual orientation discrimination in her life and her fears not only for herself but for stigmatization or harassment of her son.

The Plaintiff Mr. Greene similarly testified via affidavit with respect to his experience of discrimination as an African–American gay man. Mr. Greene repeatedly experienced discrimination in employment prior to passage of the Human Rights Ordinance. He also showed the dual effects of racism and sexual orientation discrimination in his life.

In Mr. Guckenberger's opinion, if Article XII of the charter becomes effective, it is likely that elected city representatives and other city officials will be prevented from enacting, adopting, enforcing or administering any "ordinance, rule, regulation or policy" on behalf of gay, lesbian, and bisexual citizens, regardless of its merit. Mr. Guckenberger noted that after Issue 3, laws that benefit the gay and lesbian community will have to be adopted by Charter amendment—a burdensome task that requires a city wide campaign and support of a majority of the voters; a far more onerous task than lobbying the City Council or City administration for protection of the gay community.

Moreover, the point of doing the campaign work and gaining access to council's political corridors of power is lost if counsel cannot deliver any response on the issues that affect this identifiable group. Thus, attempting to work with the City Council or administration would be rendered meaningless.

We find that by its own terms, Issue 3 singles out persons with "homosexual, lesbian or bisexual orientation." Furthermore, it does not target specific types of problems that affect all citizens for its restrictions, but rather it targets specific citizens based upon their sexual orientation. Mr. Guckenberger could recall no other time in the history of the City of Cincinnati when such a charter provision was enacted.

Finally, Cincinnati City ordinance No. 490–1992 (Human Rights Ordinance) prohibits discrimination based on many factors, including sexual orientation, in the areas of private employment, public accommodations and housing. Discrimination based upon sexual orientation, whether it be heterosexual, lesbian, gay or bisexual, is prohibited by this ordinance.

No evidence was offered by the Defendant City of Cincinnati or the intervenor to demonstrate that it is not substantially likely that the charter amendment will prohibit enforcement of the Human Rights Ordinance or EEO Ordinance insofar as they prohibit discrimination against gay men, lesbians and bisexuals. The charter amendment will not disturb enforcement of the provisions which prohibit discrimination against heterosexual people.

## STANDARD

In determining whether to issue a preliminary injunction the district court must balance four interrelated criteria:

1) Whether the Plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;

2) Whether the Plaintiffs have shown irreparable injury;

3) Whether the issuance of a preliminary injunction would cause substantial harm to others; [and]

4) Whether the public interest would be served by issuing a preliminary injunction.

*N.A.A.C.P. v. City of Mansfield, Ohio,* 866 F.2d 162, 166 (6th Cir.1989); *Weaver v. University of Cincinnati,* 942 F.2d 1039, 1043 (6th Cir.1991).

## ANALYSIS

### a) Substantial Likelihood of Success

 The Plaintiffs in this case claim that Issue 3 infringes, among other things, their fundamental right to participate equally in the political process, in violation of the Equal Protection Clause of the United States Constitution. Under the Equal Protection Clause there are three standards which may be applicable in reviewing an equal protection challenge: strict scrutiny, intermediate scrutiny, and rational basis review. *See City of Cleburne v. Cleburne Living Center, Inc.,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Legislation that infringes a fundamental right must be examined under the strict scrutiny standard of review. *Id.; Kramer v. Union Free School Dist. No. 15,* 395 U.S. 621, 626, 89 S.Ct. 1886, 1889, 23 L.Ed.2d 583 (1969). Consequently, we must first consider whether the right to participate equally in the political process is a fundamental right. As discussed below, we conclude that there is a strong likelihood that such right exists, and that the Defendant has violated it. Accordingly we review this equal protection challenge under the strict scrutiny standard of review.

### 1

We find support for our decision in the thorough analysis of the Colorado Supreme Court in *Evans v. Romer,* 854 P.2d 1270 (Colo.), *cert. denied,* —— U.S. ——, 114 S.Ct. 419, —— L.Ed.2d —— (1993). The *Evans* court noted that,

[t]he right of citizens to participate in the process of government is a core democratic value which has been recognized from the very inception of our republic up to the present time.

*Evans,* at 1276. Thus, it is not surprising that the United States Supreme Court has consistently rejected legislation establishing

preconditions on the right to vote. *See Kramer v. Union Free School Dist. No. 15,* 395 U.S. 621, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969) (invalidating law requiring children or ownership of property as precondition to vote); *Harper v. Virginia Board of Elections,* 383 U.S. 663, 86 S.Ct. 1079, 16 L.Ed.2d 169 (1966) (holding poll tax unconstitutional); *Carrington v. Rash,* 380 U.S. 89, 85 S.Ct. 775, 13 L.Ed.2d 675 (1965) (holding unconstitutional law requiring civilian status to vote).

Although these cases dealt with laws directly restricting the exercise of the franchise, we find that these cases stand for the broader principal that all people have the right to be free from restrictions which would "pose the danger of denying some citizens any *effective* voice in the governmental affairs which would substantially affect their lives." *Kramer,* 395 U.S. at 627, 89 S.Ct. at 1889 (emphasis added). Thus, "*[a]ny* unjustified discrimination in determining who may participate in *political affairs* or in the selection of public officials undermines the legitimacy of representative government." *Id.* at 626, 89 S.Ct. at 1889 (emphasis added). As a consequence, any laws which "fence out" a group of voters because of a fear of their views or because of the way they vote, threatens the group's ability to "exercise ... rights so vital to the maintenance of democratic institutions." *Carrington,* 380 U.S. at 94, 85 S.Ct. at 779. We readily conclude that these pronouncements embody principals not simply confined to cases involving the right to vote.

### 2

A second line of cases are more directly on point as they deal not with a precondition or restriction on the right to vote, but rather with the value of one's vote; in other words, the right to have one's vote count as well as be counted. *See Reynolds v. Sims,* 377 U.S. 533, 566, 84 S.Ct. 1362, 1384, 12 L.Ed.2d 506 (1964) ("[d]iluting the weight of votes because of place of residence impairs basic constitutional rights under the Fourteenth Amendment just as much as invidious discrimination based upon factors such as race"); *New York City Board of Estimate v. Morris,* 489 U.S. 688, 693, 109 S.Ct. 1433, 1438, 103 L.Ed.2d 717 (1989) ("each and every citizen has an inalienable right to full and effective participation in the political process"); *Gray v. Sanders,* 372 U.S. 368, 380, 83 S.Ct. 801, 808, 9 L.Ed.2d 821 (1963) ("the right to have one's vote counted has the same dignity as the right to put a ballot in the box").

That these cases stand for the broader proposition that all citizens have not only the right "to vote" but also the deeply rooted right to meaningful and equal participation in the political process was made crystal clear in *Reynolds v. Sims,* 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964). In *Sims,* the Court observed that with

the birth of our National Government, and the adoption and ratification of the Federal Constitution, state legislatures retained a most important place in our Nation's governmental structure. But representative government is in essence self-government through the medium of elected representatives of the people, and each and every citizen has an *inalienable right to full and effective participation in the political process* of his State's legislative bodies. *Most citizens can achieve this participation only as qualified voters through the election of legislators to represent them.* Full and effective participation by all citizens in state government requires therefore, that each citizen have an equally effective voice in the election of members of his state legislature. Modern and viable state government needs, and the Constitution demands, no less.

*Sims,* 377 U.S. at 564–65, 84 S.Ct. at 1383 (emphasis added); *New York City Board of Estimate,* 489 U.S. at 693, 109 S.Ct. at 1438.

Consequently, if a representative is powerless to act on behalf of an identifiable group, the members of that group are not "self-govern[ing] through the medium of elected representatives" *see Sims,* 377 U.S. at 565, 84 S.Ct. at 1383, and thus, the right to "put the ballot in the box" *see Gray,* 372 U.S. at 380, 83 S.Ct. at 808 (1963), is but a meaningless procedure. Simply put, the right to vote for someone who is powerless to represent the voter renders meaningless the right to vote for that person. It has been written, the right to full and fair representation "im-

ports more than the mere right to cast a vote that will be weighted as heavily as the other votes cast in the election." Lawrence H. Tribe, American Constitutional Law § 13–7, at 1074. Therefore, although gay, lesbian and bisexual citizens have the right to *cast* a vote, Issue 3's restriction on council members' and other city administrators' ability to act on their behalf eliminates the very purpose and significance of that vote.

### 3

The third type of cases crucial to our decision are cases involving candidate eligibility. Again, in these cases, actual access to the ballot box was not at issue. Rather, in *Williams v. Rhodes,* for example, the Court held that certain state election laws violated the equal protection clause because they gave "two old, established parties a decided advantage over any new parties struggling for existence and thus place substantially unequal burdens on both the right to vote and the right to associate." 393 U.S. 23, 31, 89 S.Ct. 5, 10, 21 L.Ed.2d 24 (1968). The Court continued that the "right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes." *Id.* Although the plaintiffs in *Williams* were never denied their right to *cast* a vote, the Court nonetheless referred to the right to *"vote effectively[ ]"* simply in terms of the "right to vote." *Williams,* 393 U.S. 23, 30, 31, 89 S.Ct. 5, 10 (emphasis added). Consequently, the Court required the state to demonstrate a compelling state interest.

Thus, the Court held that,

[i]n the present situation the state laws place burdens on ... the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.

\* \* \* \* \* \*

The State has here failed to show any "compelling interest" which justifies im-

posing such heavy burdens on the right to vote and to associate.

*Id.* Again, of paramount importance was the right to vote *effectively,* not the mere right "to put a ballot in the box."[1]

### 4

Finally, and perhaps most significantly, are the cases involving legislation which alters the normal political process of enacting laws with respect to an identifiable group. In *Hunter v. Erickson,* 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969), the Supreme Court invalidated an Akron, Ohio city charter amendment, passed by a majority of the voters, that provided that the city council could implement no ordinance dealing with racial, religious, or ancestral discrimination in housing without the approval of a majority of the city's voters. In applying the strict scrutiny standard of review, the Court held the amendment violative of the Equal Protection Clause. *Id.* The Court stated in unambiguous terms that,

[e]ven though Akron might have proceeded by majority vote at town meeting on all its municipal legislation, it has instead chosen a more complex system. Having done so, the State may no more disadvantage *any particular group* by making it more difficult to enact legislation in its behalf than it may dilute any person's vote or give any group a smaller representation than another of comparable size.

*Id.* at 392–93, 89 S.Ct. at 561 (emphasis added).

Similarly, in *Gordon v. Lance,* 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971), the Court considered the constitutionality of a state's constitutional and statutory mandates requiring approval of 60% of the voters before increasing bonded indebtedness, or increasing the tax rate beyond a certain amount. The Court stated that,

we can discern no *independently identifiable group or category* that favors bonded indebtedness over other forms of financing. Consequently, no sector of the popu-

---

1. In fact, the Court recognized that "the right of individuals to associate for the advancement of political beliefs, and ... the right [of voters] to

cast their votes effectively ... of course, rank among our most precious freedoms." *Williams,* 393 U.S. at 30, 89 S.Ct. at 10

lation may be 'fenced out' from the franchise because of the way they will vote.

\* \* \* \* \* \*

We conclude that so long as [the legislation does] not discriminate against or authorize discrimination against any identifiable class they do not violate the Equal Protection Clause.

*Id.* at 5, 7, 91 S.Ct. at 1892, 1892 (emphasis added) (citation and footnote omitted).

We acknowledge that *Hunter*, although significantly not *Gordon*, involved the issue of racial discrimination. We do not agree, however, that the holdings of these cases are limited to cases involving racial discrimination.[2] Rather, we conclude that these cases stand for the broader proposition that states may not disadvantage *any* identifiable group, whether a suspect category or not, by making it more difficult to enact legislation on its behalf. *See Evans*, 854 P.2d at 1281, 1283; *Gordon*, 403 U.S. at 7, 91 S.Ct. at 1892; *Hunter*, 393 U.S. 385, 393, 89 S.Ct. 557, 561; Note, *Constitutional Limits on Anti–Gay–Rights Initiatives*, 106 **Harv.L.Rev.** 1905, 1916–17 (1993). Consequently, so long as such provisions do not discriminate against or authorize discrimination against *any* identifiable class, they do not violate the Equal Protection Clause. *See Gordon*, 403 U.S. at

7, 91 S.Ct. at 1892 (emphasis added) (footnote omitted); *Hunter*, 393 U.S. 385, 393, 89 S.Ct. 557, 561; *Evans*, 854 P.2d at 1281, 1283; *see also Taxpayers United v. Austin*, 994 F.2d 291, 297 (6th Cir.1993) (upholding constitutionality of nondiscriminatory restriction on ability to use the "initiative procedure" in Michigan, but cautioning that "[o]ur result would be different if ... [the plaintiffs] were being treated differently than other groups seeking to initiate legislation").[3]

**5**

■ In light of the forgoing, and based on the record, we conclude that there is a strong likelihood that under the Issue 3 Amendment, all citizens, with the express exception of gay, lesbian and bisexual citizens, have the right to appeal directly to the members of city council for legislation, while only members of the Plaintiffs' identifiable group must proceed via the exceptionally arduous and costly route of amending the city charter before they may obtain any legislation bearing on their sexual orientation. Thus, there is a substantial likelihood that the Issue 3 Amendment "fences out" an identifiable group of citizens—gay, lesbian and bisexuals—from the political process by imposing upon them an added and significant burden on their quest for favorable legislation, regu-

---

2. First, the cases speak unmistakably in race-neutral terms. *See, e.g., Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969) ("State may no more disadvantage *any particular group* ..."); *Washington v. Seattle School District No. 1*, 458 U.S. 457, 470, 102 S.Ct. 3187, 3194, 73 L.Ed.2d 896 (1982) ("laws structuring political institutions or allocating power according to "neutral principles ... are not subject to equal protection attack"); *Gordon v. Lance*, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971) ("so long as the [legislation does] not discriminate against or authorize discrimination against *any identifiable class* ...").

Furthermore, *Gordon*, a case not involving race, was distinguished from *Hunter* not because the legislation in *Gordon* did not specifically involve a racial minority, but rather because the legislation involved no identifiable group at all. Thus, as the Supreme Court of Colorado pointed out, if *Hunter* were decided solely on the basis of the "suspect" nature of the class[] involved, there would have been no need for the Court to consistently express the paramount importance of political participation or to subject legisla-

tion which infringed on the right to participate equally in the political process to strict judicial scrutiny. To the contrary, were [*Hunter*] ... simply a "race case[]" the Supreme Court would have been required to do nothing more than to note that the legislation at issue drew a distinction that was inherently suspect (*i.e.*, that discriminated on the basis of race), and apply strict scrutiny to resolve [that] case[]— irrespective of the right, entitlement, or opportunity that was being restricted.... *Kramer v. Union School Free District No. 15*, 395 U.S. 621, 628, n. 9, 89 S.Ct. 1886, 1890, n. 9.... *Evans v. Romer*, 854 P.2d 1270, 1283 (Colo. 1993); *see Citizens for Responsible Behavior v. Sup. Court*, 2 Cal.Rptr.2d 648, 656 (Cal.App. 1991).

3. We note that despite the Defendants' urging, we decline to interpret the phrase "identifiable group" as used in the above cases to be synonymous with the phrase "suspect category." *See, e.g., Anderson v. Celebrezze*, 460 U.S. 780, 791, 792, 103 S.Ct. 1564, 1571, 1572, 75 L.Ed.2d 547 (1983) (labeling supporters of independent political candidate "identifiable group").

lation and policy from the City Council and city administration.[4]

Furthermore, with respect to the Plaintiffs' First Amendment claims, in this case, not only will gay, lesbian and bisexual citizens be virtually unable to obtain legislation for their group no matter how great the need, but also their advocacy may expose them to discrimination for which they will have no recourse even remotely comparable to that of other groups, to obtain protection, thereby increasing the risks of, and consequently chilling, such expression.[5]

Therefore, we find a substantial likelihood that Issue 3 will "ha[ve] the inevitable effect of reducing the total quantum of speech on a public issue" *see Meyer v. Grant*, 486 U.S. 414, 423, 108 S.Ct. 1886, 1892, 100 L.Ed.2d 425 (1988); as such, there is a substantial likelihood that the implementation of issue 3 will chill the First Amendment rights of citizens and organizations dedicated to the advocacy of issues affecting the gay, lesbian and bisexual community. *See id.; see also Merrick v. Board of Higher Education*, 116 Or. App. 258, 841 P.2d 646, 651 (1992) ("Not only does the statute discourage [gays, lesbians and bisexuals] from telling others their sexual orientation, it also discourages them from becoming involved in groups advocating gay and lesbian rights, a constitutionally protected activity, because such involvement might expose them to personnel action. The statute's practical effect is to chill speech and other expression and to severely limit open communication . . . .").

7

Finally, we find especially significant the fact that under the Cincinnati Human Rights Ordinance heterosexuals are still a protected class of people, while Issue 3 would remove only gay, lesbian and bisexual citizens from those citizens protected from the ordinance's prohibition of discrimination based on sexual orientation. This only reinforces our conclusion that the Defendants have proffered no compelling justification to single out gay, lesbian and bisexual citizens for the additional and substantial burdens imposed on their ability to obtain legislation not required of any other identifiable group of citizens. The Court is unaware of what compelling state interest is furthered by removing City Council's and the City administration's ability to address the concerns of one single group of people no matter what need may arise in the future and under what circumstances, while all others may benefit from the direct action of the City Council and City administrators.[6]

Consequently, the Court finds that there is a substantial likelihood that Issue 3 infringes the Plaintiffs' First Amendment rights, and their fundamental right to participate equally in the political process. Similarly, we find that there is a strong likelihood that there is no a compelling state interest in the enactment of Issue 3.

**b) Irreparable Harm and Harm to Others**

We also conclude that the Plaintiffs will suffer irreparable harm if the Court does not issue the injunction because of the threatened infringement of the Plaintiffs' fundamental rights. *See Evans v. Romer*, 854 P.2d 1270, 1286 (Colo.), *cert. denied*, —— U.S. ——, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993); *Elrod v. Burns*, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689, 49 L.Ed.2d 547 (1976) (citing *New York Times Co. v. United States*, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971)); *Weaver v. University of Cincinnati*, 942 F.2d 1039, 1043 (6th Cir.1991). Similarly, we conclude that maintaining the status quo under

---

**4.** As Mr. Guckenberger testified, there is a "dramatic difference" between getting an ordinance passed and getting a charter amendment passed.

**5.** In fact, one witness testified that with the passage of issue 3, some members of organizations advocating gay, lesbians and bisexual rights have ceased donating to the organizations.

**6.** We also note that even under a rational basis standard of review, based on the record, there is a significant likelihood that amendment 3 would not pass muster. *See Steffan v. Aspin*, No. 91–5409, 8 F.3d 57, 68–70, (D.C.Cir.1993) (military's ban on homosexuals lacked rational basis); *Pruitt v. Cheney*, 963 F.2d 1160, 1166 (9th Cir. 1991), *cert. denied*, —— U.S. ——, 113 S.Ct. 655, 121 L.Ed.2d 581 (1992) (same); *Citizens for Responsible Behavior v. Sup. Court.*, 1 Cal.App.4th 1013, 2 Cal.Rptr.2d 648, 656 (1991) (anti-gay initiative requiring a majority vote to enact any prohibition on sexual orientation discrimination lacked rational basis).

the existing City Human Rights Ordinance and EEO Ordinance is the far more prudent course of action in light of the nature of the threat faced by the Plaintiffs in, among other things, their employment and housing situations. Thus, while no harm will occur to others if the preliminary injunction is issued, the increased threat of harassment which we view as likely to occur if Issue 3 is given effect, would seriously undermine the public interest.

## CONCLUSION

Accordingly, the Court hereby GRANTS the Plaintiffs' Motion for Preliminary Injunction, prohibiting the implementation of issue 3, until further order of this Court, and ORDERS the Plaintiffs to post bond in the amount of one hundred dollars.

SO ORDERED.