EQUALITY FOUNDATION OF GREAT-ER CINCINNATI, INC., Richard Buchanan, Chad Bush, Edwin Greene, Rita Mathis, Roger Asterino, and H.O.M.E., Inc., Plaintiffs–Appellees,

v.

CITY OF CINCINNATI (94–3973/4280), Defendant–Appellant,

Equal Rights Not Special Rights, Mark Miller, Thomas E. Brinkman, Jr., and Albert Moore (94–3855), Intervening Defendants–Appellants.

Nos. 94–3855, 94–3973, 94–4280.

United States Court of Appeals, Sixth Circuit.

May 12, 1995.

262

Suzanne B. Goldberg (briefed), New York City, Alphonse A. Gerhardstein (argued and briefed), Laufman, Rauh & Gerhardstein, Scott T. Greenwood (briefed), Greenwood & Hudson, Cincinnati, OH, Patricia M. Logue (briefed), Chicago, IL, for plaintiffs-appellees.

Karl P. Kadon, III (argued), City Solicitor's Office for the City of Cincinnati, Cincinnati, OH, for defendant.

Michael A. Carvin (argued and briefed), William L. McGrath (briefed), Shaw, Pittman, Potts & Trowbridge, Washington, DC, John J. Fossett, Fossett, Howe, Wessels & Ogle, Ft. Wright, KY, Robert K. Skolrood, National Legal Foundation, Virginia Beach, VA, Robert H. Bork, American Enterprise

Institute for Public Research, Washington, DC, for intervenors-appellants.

Thomas W. Condit (briefed), Condit & Dressing, Cincinnati, OH, amicus curiae The American Family Ass'n of Ohio.

Robert E. Manley (briefed), Manley, Burke, Fischer & Lipton, Cincinnati, OH, amicus curiae Cincinnati Federation of Teachers, et al.

Alice L. Brown, Alan Jenkins (briefed), NAACP Legal Defense & Educational Fund, New York City, amicus curiae NAACP Legal Defense and Educational Fund, Inc.

Eric J. Graninger (briefed), Louisville, KY, amicus curiae James E. Andrews.

Paul M. Smith (briefed), Jenner & Block, Washington, DC, amicus curiae The American Psychological Ass'n, et al.

Richard A. Cordray (briefed), Marianne Neal, Asst. Atty. Gen., Office of the Atty. Gen. of Ohio, Columbus, OH, amicus curiae Ohio Atty. Gen.

Before: KENNEDY, KRUPANSKY, and NORRIS, Circuit Judges.

KRUPANSKY, Circuit Judge.

In case numbers 94–3855/3973, defendant/appellant the City of Cincinnati ("the City"), and intervening defendants/appellants Equal Rights Not Special Rights ("ERNSR"), Mark Miller, Thomas E. Brinkman, Jr., and Albert Moore, challenged the lower court's invalidation of, and permanent injunction restraining implementation of, an amendment to the City Charter of Cincinnati ("the Charter") denominated "Issue 3" which was enacted by popular vote on November 2, 1993 and which then became Article XII of the Charter ("the Amendment"), for purported constitutional infirmities. In case number 94–4280, the City contested the district court's award of attorneys' fees and costs in favor of the plaintiffs.

On March 13, 1991, the Cincinnati City Council (the "Council") enacted Ordinance No. 79–1991, commonly known as the "Equal Employment Opportunity Ordinance." This measure provided that the City could not discriminate in its own hiring practices on the basis of

classification factors such as race, color, sex, handicap, religion, national or ethnic origin, age, *sexual orientation,* HIV status, Appalachian regional ancestry, and marital status. (Emphasis added).

Subsequently, Council on November 25, 1992 adopted Ordinance No. 490–1992 (commonly referred to as the "Human Rights Ordinance") which prohibited, among other things, private discrimination in employment, housing, or public accommodation for reasons of sexual orientation. The opening paragraph of the Human Rights Ordinance expressed the purpose for the legislation as:

PROHIBITING unlawful discriminatory practices in the City of Cincinnati based on race, gender, age, color, religion, disability status, *sexual orientation,* marital status, or ethnic, national or Appalachian regional origin, in *employment, housing,* and *public accommodations* by ordaining Chapter 914, Cincinnati Municipal Code. (Emphasis added).

Among other things, the new law created complaint and hearing procedures for purported victims of sexual orientation discrimination, and exposed offenders to potential civil and criminal penalties.

ERNSR was organized for the purpose of eliminating special legal protection accorded to persons based upon their sexual orientation pursuant to the Human Rights Ordinance. ERNSR campaigned to rescind the Human Rights Ordinance by enacting a proposed City Charter amendment (Issue 3), which was to be submitted directly to the voters on the November 2, 1993 local ballot. On July 6, 1993, plaintiff Equality Foundation of Greater Cincinnati, Inc. ("Equality Foundation") was incorporated by the opponents of the ERNSR agenda. A vigorous political contest between ERNSR and Equality Foundation, involving aggressive campaigning by both sides and high media exposure, ensued over Issue 3.

The ERNSR-sponsored proposed charter amendment ultimately appeared on the November 2, 1993 ballot as:

## ARTICLE XII

### NO SPECIAL CLASS STATUS MAY BE GRANTED BASED UPON SEXUAL ORIENTATION, CONDUCT OR RELATIONSHIPS.

The City of Cincinnati and its various Boards and Commissions may not enact, adopt, enforce or administer any ordinance, regulation, rule or policy which provides that homosexual, lesbian, or bisexual orientation, status, conduct, or relationship constitutes, entitles, or otherwise provides a person with the basis to have any claim of minority or protected status, quota preference or other preferential treatment. This provision of the City Charter shall in all respects be self-executing. Any ordinance, regulation, rule or policy enacted before this amendment is adopted that violates the foregoing prohibition shall be null and void and of no force or effect.

Issue 3 passed by a popular vote of approximately 62% in favor and 38% opposed and became Amendment XII to the Cincinnati City Charter.

On November 8, 1993, plaintiffs Equality Foundation, several individual homosexuals (Richard Buchanan, Chad Bush, Edwin Greene, Rita Mathis, and Roger Asterino), and Housing Opportunities Made Equal, Inc. ("H.O.M.E.") (a housing rights organization) filed a complaint against the City under 42 U.S.C. § 1983 which alleged that their constitutional rights had been, or would potentially be, violated by the adoption of Issue 3, and sought temporary and permanent injunctive relief, a declaration that the Amendment was unconstitutional, and an award of costs (including attorneys' fees) under 42 U.S.C. § 1988. On November 15, 1993, ERNSR, Mark Miller, Thomas E. Brinkman, Jr., and Albert Moore moved to intervene as parties allied with the City. On November 16, 1993, the trial court preliminarily enjoined the City from enforcing the Amendment. *Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati (Equality I)*, 838 F.Supp. 1235, 1243 (S.D.Ohio 1993). On December 27, 1993, the district court granted the intervention motion. On June 3, 1994, the trial court rejected a summary judgment motion initiated by the City and ERNSR.

A bench trial was conducted which generated extensive expert testimony reflecting the social, political, and economic standing of homosexuals throughout the nation and the homophobic discriminations that had been experienced by the individual plaintiffs and others. Subsequent to trial the judge issued extensive findings of fact.[1] *Equality Foun-*

1. The trial judge made the following findings:
   1. Homosexuals comprise between 5 and 13% of the population.
   2. Sexual orientation is a characteristic which exists separately and independently from sexual conduct or behavior.
   3. Sexual orientation is a deeply rooted, complex combination of factors including a predisposition towards affiliation, affection, or bonding with members of the opposite and/or the same gender.
   5. [sic] Sexual behavior is not necessarily a good predictor of a person's sexual orientation.
   6. Gender non-conformity such as cross-dressing is not indicative of homosexuality.
   8. [sic] Sexual orientation is set in at a very early age—3 to 5 years—and is not only involuntary, but is unamenable to change.
   9. Sexual orientation bears no relation to an individual's ability to perform, contribute to, or participate in, society.
   10. There is no meaningful difference between children raised by gays and lesbians and those raised by heterosexuals. Similarly, children raised by gay and lesbian parents are no more likely to be gay or lesbian than those children raised by heterosexuals.
   11. There is no correlation between homosexuality and pedophilia. Homosexuality is not indicative of a tendency towards child molestation.
   12. Homosexuality is not a mental illness.
   13. Homosexuals have suffered a history of pervasive irrational and invidious discrimination in government and private employment, in political organization and in all facets of society in general, based on their sexual orientation.
   14. Pervasive private and institutional discrimination against gays, lesbians and bisexuals often has a profound negative psychological impact on gays, lesbians and bisexuals.
   15. Gays, lesbians and bisexuals are an identifiable group based on their sexual orientation and their shared history of discrimination based on that characteristic.
   16. Gays, lesbians and bisexuals are often the target of violence by heterosexuals due to their sexual orientation.
   17. In at least certain crucial respects, gays, lesbians and bisexuals are relatively politically powerless.
   18. Coalition building plays a crucial role in a group's ability to obtain legislation in its be-

*dation of Greater Cincinnati, Inc. v. City of Cincinnati (Equality II),* 860 F.Supp. 417, 426–27 (S.D. Ohio 1994). It concluded that the Amendment infringed the plaintiffs' purported "fundamental right to equal access to the political process," as well as First Amendment rights of free speech and association and the right to petition the government for redress of grievances, which violations of constitutional rights subjected the Amendment to a "strict scrutiny" constitutional evaluation. Additionally, the district court posited that, because homosexuals collectively comprise a "quasi-suspect class," the Amendment was alternatively reviewable under the intermediate "heightened scrutiny" constitutional standard. Moreover, the lower court found that "[the Amendment] was insufficiently linked to any governmental interest to pass constitutional muster", even under the deferential "rational basis" test. Finally, the district court adjudged the Amendment constitutionally deficient for vagueness. *Id.* at 449. On November 15, 1994, the district court awarded $339,430.25 in attorneys' fees plus $35,028.07 in costs to the plaintiffs, to be paid by the City.

■■■ Generally, this court reviews findings of fact for clear error and conclusions of law *de novo. United States v. Critton,* 43 F.3d 1089, 1098 (6th Cir.1995); *Rodgers v. Jabe,* 43 F.3d 1082, 1085 (6th Cir.1995). However, where ostensible "findings of fact" are, in reality, findings of "ultimate" facts which entail the application of law, or constitute sociological judgments which transcend ordinary factual determinations, such "find-

ings" must be reviewed *de novo. Bose Corporation v. Consumers Union of United States, Inc.,* 466 U.S. 485, 500–01 & n. 16, 104 S.Ct. 1949, 1959 & n. 16, 80 L.Ed.2d 502 (1984); *Powell v. Texas,* 392 U.S. 514, 521–22, 88 S.Ct. 2145, 2148–49, 20 L.Ed.2d 1254 (1968); *Whitney v. Brown,* 882 F.2d 1068, 1071 (6th Cir.1989). Moreover, mixed questions of law and fact, like pure questions of law or of statutory interpretation, are reviewed *de novo. Paul Revere Life Insurance Co. v. Brock,* 28 F.3d 551, 553 (6th Cir.1994). Furthermore, the sufficiency of the evidence to support a finding that a constitutional predicate (such as "actual malice" in a defamation action prosecuted by a public official) has been satisfied presents a question of law. *Harte–Hanks Communications, Inc. v. Connaughton,* 491 U.S. 657, 685–89, 109 S.Ct. 2678, 2694–96, 105 L.Ed.2d 562 (1989); *New York Times v. Sullivan,* 376 U.S. 254, 284–86 & n. 26, 84 S.Ct. 710, 728–29 & n. 26, 11 L.Ed.2d 686 (1964). Because most, if not all, of the lower court's findings in the instant case constituted ultimate facts and interrelated applications of law, sociological judgments, mixed questions of law and fact, and/or findings designed to support "constitutional facts" (to wit, the existence of a "quasi-suspect" class, or of a fundamental right which was invaded by the Amendment), *see* Note 1, *supra,* they are subject to plenary review.

■■■ The constitutional guarantee of equal protection insulates citizens, only from unlawfully discriminatory *state action;* it

half. Gays, lesbians and bisexuals suffer a serious inability to form coalitions with other groups in pursuit of favorable legislation.

19. No Federal laws prohibit discrimination based on sexual orientation. Furthermore, voter back-lash around the country has lead [sic] to the repeal of numerous laws prohibiting discrimination against gays, lesbians and bisexuals. In 38 of the approximately ·125 state and local communities where some sort of measure prohibiting discrimination based on sexual orientation has been adopted, voter initiated referendums have been placed on the ballot to repeal those gains. 34 of the 38 were approved.

20. The amount of resources spent by the City on processing and investigating discrimination complaints by gays, lesbians and bisexuals is negligible. City resources spent on processing

and investigating all sexual orientation discrimination complaints is negligible.

21. The inclusion of protection for homosexuals does not detract form [sic] the City's ability to continue its protection of other groups covered by the City's anti-discrimination provisions.

22. Amending the City Charter is a far more onerous and resource-consuming task than is lobbying the City Council or city administration for legislation; it requires a city wide campaign and support of a majority of voters. City Council requires a bare majority to enact or adopt legislation.

23. ERNSR campaign materials were riddled with unreliable data, irrational misconceptions and insupportable misrepresentations about homosexuals.

constructs no barrier against *private* discrimination, irrespective of the degree of wrongfulness of such private discrimination. *Moose Lodge No. 107 v. Irvis,* 407 U.S. 163, 172, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972). The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution did not *compel* the City of Cincinnati to enact legislation to protect homosexuals from discrimination, and accordingly the City, through its ordinary legislative processes, was at liberty to rescind any previous enactments which had fashioned such safeguards. *See Crawford v. Board of Education of Los Angeles,* 458 U.S. 527, 538, 102 S.Ct. 3211, 3218, 73 L.Ed.2d 948 (1982). Accordingly, the mere *repeal* of certain sections of the Human Rights Ordinance which had previously protected homosexuals, lesbians, and bisexuals was not itself constitutionally assailable. However, the district court ruled that the Amendment not only nullified the previously-enacted special legal protection for homosexuals; rather, it assertedly prevented a distinct class of citizens from exercising certain equal protection and First Amendment rights in the future, which, in the lower court's analysis, triggered constitutional review of the Amendment. *See Equality II,* 860 F.Supp. at 428–34.

The Supreme Court has announced three tests against which the constitutional validity of a law (in this case, a city charter amendment) which purportedly disproportionately burdens a discrete class, or deprives some group of a purported right, may be judged. Generally, the "legislation is presumed to be valid and will be sustained if the classification drawn by the statute [or city charter amendment] is rationally related to a legitimate state interest." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). This presumption of validity characteristic of the "rational relationship" rule typically applies to social and economic enactments, where the Court has recognized that "the Equal Protection Clause allows the States wide latitude, [citations], and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Id.* By contrast, where a statute targets a "suspect classification" (such as race, alienage, or national origin) which is seldom relevant to any legitimate state interest, or where a constitutional "fundamental right" is assaulted by operation of the legislation, a "strict scrutiny" test (the most rigorous constitutional standard) controls, and the enactment "will be sustained only if [it is] suitably tailored to serve a compelling state interest." *Id.* Finally, where a statute uniquely burdens a "quasi-suspect" class (a categorization such as gender or illegitimacy which, under most circumstances, but not all, does not create a sensible legislative distinction), the intermediate constitutional test of "heightened scrutiny" applies, and such law is presumed invalid unless it is "substantially related to a sufficiently important governmental interest." *Id.,* 473 U.S. at 440–41, 105 S.Ct. at 3254–55. The trial court, in the instant case, posited that homosexuals comprise a "quasi-suspect" class and, accordingly, applied the intermediate "heightened scrutiny" standard to the equal protection analysis of the Amendment. *Equality II,* 860 F.Supp. at 434–40.

In declaring this novel ruling, the lower court in the instant case misconstrued *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986), wherein the Court mandated that homosexuals possess no fundamental right to engage in homosexual conduct and consequently that conduct could be criminalized. The *Bowers* Court further directed that the courts should resist tailoring novel fundamental rights. *Id.,* 478 U.S. at 195, 106 S.Ct. at 2846. Since *Bowers,* every circuit court which has addressed the issue has decreed that homosexuals are entitled to no special constitutional protection, as either a suspect or a quasi-suspect class, because the conduct which places them in that class is not constitutionally protected.[2]

---

**2.** *Steffan v. Perry,* 41 F.3d 677, 684 n. 3 (D.C.Cir. 1994) (*en banc*) (following *Padula v. Webster,* 822 F.2d 97, 103 (D.C.Cir.1987) ("It would be quite anomalous, on its face, to declare status defined by conduct that states may constitutionally criminalize as deserving of strict scrutiny under the equal protection clause")); *Ben–Shalom v. Marsh,* 881 F.2d 454, 464 (7th Cir.1989), *cert. denied,* 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990) ("If homosexual conduct

The court below distinguished *Bowers* and its progeny by postulating that the Amendment does not create a *conduct*-based classification, but instead demarcated a *status*-based categorization. The trial court found that gays, lesbians, and bisexuals are not identified by any particular conduct; to the contrary, they are distinguished by their "sexual orientation," which references an innate and involuntary state of being and set of drives.[3] *Equality II*, 860 F.Supp. at 440. From this perspective, the Amendment uniquely affected individuals belonging to a discrete segment of society on the basis of their *status* as persons oriented towards a particular sexual attraction or lifestyle. *See id.* at 436–37.

Assuming *arguendo* the truth of the scientific theory that sexual orientation is a "characteristic beyond the control of the individual" as found by the trial court, *see id.* at 437, the reality remains that no law can successfully be drafted that is calculated to burden or penalize, or to benefit or protect, an unidentifiable group or class of individuals whose identity is defined by subjective and unapparent characteristics such as innate desires, drives, and thoughts. Those persons having a homosexual "orientation" simply do not, as such, comprise an identifiable class. Many homosexuals successfully conceal their orientation. Because homosexuals generally are not identifiable "on sight" unless they elect to be so identifiable by conduct (such as public displays of homosexual affection or self-proclamation of homosexual tendencies),

they cannot constitute a suspect class or a quasi-suspect class because "they do not [necessarily] exhibit obvious, immutable, or distinguishing characteristics that define them as a discrete group[.]" *Bowen v. Gilliard*, 483 U.S. 587, 602, 107 S.Ct. 3008, 3018, 97 L.Ed.2d 485 (1987).

Those persons who fall within the orbit of legislation concerning sexual orientation are so affected not because of their orientation but rather by their *conduct* which identifies them as homosexual, bisexual, or heterosexual. Indeed, from the testimony developed by the record (including that of the plaintiffs' expert psychologist, Dr. John Gonsiorek, who attested that most people either engage in sexual behavior which is consistent with their sexual orientation or engage in no sexual activity at all), this court concludes that, for purposes of these proceedings, it is virtually impossible to distinguish or separate individuals of a particular *orientation* which predisposes them toward a particular sexual conduct from those who actually *engage* in that particular type of sexual conduct. *See, e.g., Ben–Shalom v. Marsh*, 881 F.2d at 463–64 (although individual exceptions may exist, a lesbian orientation is compelling evidence that the plaintiff has engaged in homosexual conduct and likely will do so again, and consequently a regulation which classifies lesbians does not categorize merely upon status but also upon the reasonable inferences perceived from probable past and future sexual conduct).[4]

---

may constitutionally be criminalized, then homosexuals do not constitute a suspect or quasi-suspect class entitled to greater than rational basis scrutiny for equal protection purposes"); *High Tech Gays v. Defense Industrial Security Clearance Office*, 895 F.2d 563, 571 (9th Cir. 1990) (same); *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed.Cir.1989), *cert. denied*, 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990) (homosexuality is primarily behavioral in nature and as such is not immutable; "[a]fter *Hardwick* it cannot logically be asserted that discrimination against homosexuals is constitutionally infirm").

  *Accord, Baker v. Wade*, 769 F.2d 289, 292 (5th Cir.1985) (*en banc*), *cert. denied*, 478 U.S. 1022, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986) (homosexuals compose neither a suspect nor a quasi-suspect class); *National Gay Task Force v. Board of Education of Oklahoma City*, 729 F.2d 1270, 1273 (10th Cir.1984), *aff'd mem. by an equally*

divided Court, 470 U.S. 903, 105 S.Ct. 1858, 84 L.Ed.2d 776 (1985) (legal classification of gays is not suspect) (both decided prior to *Bowers*).

**3.** *See* Findings of Fact Nos. 2–8, *Equality Foundation*, 860 F.Supp. at 426, *quoted* at Note 1, *supra*.

**4.** In any event, the Amendment passes equal protection scrutiny *even if* it is read as affecting a status-defined class, in that it imposes no *punishment* or *disability* upon persons belonging to that group but rather merely removes previously legislated *special protection* against discrimination from that segment of the population:

  It is true that the Constitution forbids *criminal punishments* based on a person's qualities—we assume that this is what is meant by "status"—rather than on his or her conduct. [Citation]. Yet, *this proposition has never meant that em-*

Therefore, *Bowers v. Hardwick* and its progeny command that, as a matter of law, gays, lesbians, and bisexuals cannot constitute either a "suspect class" or a "quasi-suspect class," and, accordingly, the district court's application of the intermediate heightened scrutiny standard to the constitutional analysis of the Amendment was erroneous.

■ In the alternative, the district court pronounced that the Amendment had denied the plaintiffs their purported "Fundamental Right to equal participation in the political process," which asserted constitutional deprivation triggered review under the highly demanding "strict scrutiny" standard. *Equality II*, 860 F.Supp. at 430–34. Because the Amendment foreclosed Council from legislating future preferential treatment for homosexuals, the trial court concluded that homosexuals had been deprived of their right to petition the municipal legislative forum for enactments designed to protect and advance

their collective agenda. The court below erroneously fashioned this innovative right [5] from three Supreme Court decisions: *Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969); *Gordon v. Lance*, 403 U.S. 1, 91 S.Ct. 1889, 29 L.Ed.2d 273 (1971); and *Washington v. Seattle School District No. 1*, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982).

In *Hunter*, the Court strictly scrutinized, and struck down, a voter-adopted amendment to the Akron City Charter which foreclosed the city council from legislating any race-based prohibition against discrimination in private housing without the prior authorization of a majority of the voters. The *Hunter* opinion was anchored in the "suspect classification" of race, *not* in any averred fundamental right to lobby the city council for favorable legislation. *Hunter*, 393 U.S. at 391–92, 89 S.Ct. at 561. *See James v. Valtierra*, 402 U.S. 137, 91 S.Ct. 1331, 28 L.Ed.2d 678 (1971); [6] *Arthur v. City of Tole-*

---

*ployment decisions*—which is what *this* case is about—*cannot be made on such a basis*. One cannot be put in jail for having been born blind (although a blind person who drives a truck and kills someone could be jailed for his act). But it obviously would be constitutional for the military to prohibit blind people from serving in the armed forces, even though congenital blindness is certainly a sort of "status." *Steffan v. Perry*, 41 F.3d 677, 687 (D.C.Cir. 1994) (*en banc*) (emphasis partially added) (sustaining military regulations banning homosexuals from the Naval Academy and from service in the Navy).

*Compare Bowers v. Hardwick*, in which the Supreme Court validated a state-imposed *criminal sanction* against sodomy. By contrast, the Amendment did not punish or prohibit any aspect of the homosexual lifestyle, and indeed did not compel the deprivation of anything from any person by the use of government power because of his or her sexual orientation.

5. No circuit court of appeals has expressly recognized a general constitutional right to "participate fully in the political process." However, the United States Supreme Court has recently granted *certiorari* in a case in which the Colorado Supreme Court found a broad fundamental right to participate equally in the political process. *Evans v. Romer (Evans II)*, 882 P.2d 1335 (Colo. 1994), *cert. granted*, —— U.S. ——, 115 S.Ct. 1092, 130 L.Ed.2d 1061 (1995) (striking down as unconstitutional Colorado's Amendment 2, a voter-initiated amendment to the Colorado constitution similar to Cincinnati's Issue 3). *See also Evans v. Romer (Evans I)*, 854 P.2d 1270, 1276–

84 (Colo.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 419, 126 L.Ed.2d 365 (1993).

6. In *James*, a voter-approved amendment to the California constitution directed that no public housing project could be maintained without the prior approval of a majority of those voting in the local community election. This amendment created the same procedural hurdle as reviewed in *Hunter*—certain classes of local legislation could take effect only with the approval of the majority of local voters. However, in *James*, no suspect class or fundamental right was at issue. The *James* Court declared:

The Court [in *Hunter*] held that the amendment created a classification based upon race because it required that laws dealing with racial housing matters could take effect only if they survived a mandatory referendum while other housing ordinances took effect without any such special election.

\* \* \* \* \* \*

*Unlike the Akron referendum provision, it cannot be said that [the California amendment] rests on "distinctions based on race."* [Citation]. The [California] Article requires referendum approval for any low-rent public housing project, not only for projects which will be occupied by a racial minority. And the record here would not support any claim that a law seemingly neutral on its face is in fact aimed at a racial minority. [Citation]. *The present case could be affirmed only by extending Hunter, and this we decline to do. Id.*, 402 U.S. at 140–41, 91 S.Ct. at 1333. (Emphasis added).

*do,* 782 F.2d 565, 573 n. 2 (6th Cir.1986). Likewise, *Washington v. Seattle School District No. 1,* in which the high Court invalidated a state voter approved initiative which was designed to preclude bussing of students to achieve racial desegregation, turned upon a suspect racial classification. *Washington,* 458 U.S. at 484–87, 102 S.Ct. at 3202–04. *See also Arthur,* 782 F.2d at 573 n. 2, 574. Finally, *Gordon v. Lance* involved the recognized fundamental right to *vote,*[7] not an all-inclusive asserted right to participate fully in the political process. *Cf. Taxpayers United for Assessment Cuts v. Austin,* 994 F.2d 291 (6th Cir.1993) (ruling that, unlike voting, the "right" to sign an initiative petition, and the "right" to obtain certification of a proposed initiative, are not fundamental, thereby deciding by necessary implication that non-voting forms of political activity are not categorically fundamental).

The instant Amendment deprived no one of the right to vote, nor did it reduce the relative weight of any person's vote. Pursuant to the Amendment, homosexuals remained empowered to vote for City Council members and to lobby those Council members concerning issues of interest. The only effect of the Amendment upon Cincinnati citizens was to render futile the lobbying of Council for preferential enactments for homosexuals *qua* homosexuals because the electorate placed the enactment of such legislation beyond the scope of Council's authority. *See Hunter,* 393 U.S. at 392, 89 S.Ct. at 561. The Amendment does not impair homosexuals and other interested parties from seeking to repeal the Amendment on another day through the same political process by which Issue 3 became law—the charter amendment procedure. In addition, gays, lesbians, and bisexuals may seek relief through other political avenues and fora, such as the Ohio state legislature or the United States Congress. As the *realization* of their political agenda is not constitutionally guaranteed, the narrow restriction created by the Amendment upon the political avenues available to the unidentifiable and non-protected class of homosexuals and their allies respecting a narrow spectrum of substantive issues clearly does not rise to constitutional dimensions. Those who opposed Issue 3 simply lost one battle of an ongoing political dispute.

■■■ The district court directed that the Amendment impermissibly burdened the plaintiffs' First Amendment rights of free speech and association, and their right to petition the government for redress of grievances. *Equality II,* 860 F.Supp. at 444–47. This reviewing court rejects that conclusion. The Amendment erected no official obstacle to the exercise of anyone's free speech or free association rights. The Amendment's forbearance from prohibiting private citizen discrimination against homosexuals for public homosexually oriented speech or association is constitutionally nonproblematic because the First Amendment prohibits only *governmental* burdens upon speech and association; it does not command the government to insulate any person from the effects of *private* action resulting from the exercise of free speech or association rights.[8] *See, e.g., United States v. Kokinda,* 497 U.S. 720, 725, 110 S.Ct. 3115, 3119, 111 L.Ed.2d 571 (1990) (pri-

---

7. In *Gordon,* the Justices *rejected* the claim that a state constitutional requirement that state bonded indebtedness or tax rates may not exceed certain levels in the absence of 60% voter approval by referendum violated the United States Constitution, dictating that this provision deprived no group of its fundamental right to vote, even though in some instances a majority vote would be insufficient to affect policy on a particular subject, and further ruled that no "discrete or insular minority" was disabled thereby. *Id.,* 403 U.S. at 2–6, 91 S.Ct. at 1890–92.

8. Furthermore, the Amendment's removal of special protection for homosexuals from the City's official hiring practices is not constitutionally invalid. The Amendment did not *mandate* governmental discrimination against homosexuals in municipal employment but rather merely eliminated the categorical bar embodied in the Equal Employment Opportunity Ordinance which precluded *all* sexual orientation-based employment discrimination by the City in every context. The eradication of this all-encompassing special protection does not remove whatever restraints the Constitution may independently impose upon the City regarding employment practices as related to the exercise of free speech or free association rights, or other constitutional rights, by municipal employees or job applicants. This appellate review need not decide, and therefore does not address, the scope of this constitutional safeguard, if any, in the instant appeal.

vate businesses enjoy absolute freedom from First Amendment constraints); *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777, 106 S.Ct. 1558, 1564, 89 L.Ed.2d 783 (1986) (the First Amendment by its terms applies only to governmental action). Finally, the plaintiffs' right to petition the government for redress of grievances has not been violated, because, as already discussed, gay, lesbian, and/or bisexual access to Council and to other political avenues and fora has not been obstructed.

■ Because the Amendment implicated no suspect or quasi-suspect class and burdened no fundamental right, the "rational relationship" test (which dictates that the legislation must stand if it is rationally related to any legitimate state interest) is the appropriate standard by which the constitutionality of the Charter Amendment should be judged. *See City of Cleburne, supra.* Under this highly deferential standard, social or economic legislation must be affirmed "if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Federal Communications Commission v. Beach Communications, Inc.,* — U.S. —, 113 S.Ct. 2096, 2101, 124 L.Ed.2d 211 (1993). The party challenging the rationality of legislation bears the burden of negating *every conceivable basis* for the act, regardless of whether or not such supporting rationale was cited by, or actually relied upon by, the promulgating authority.[9] *Id.* at —, 113 S.Ct. at 2102. In reviewing the justifications for a legislative enactment, the court may not "sit as a superlegislature to judge the wisdom or desirability of legislative policy determinations made in areas that neither affect fundamental rights nor proceed along suspect lines." *Heller v. Doe by Doe,* — U.S. —, —, 113 S.Ct. 2637, 2642, 125 L.Ed.2d 257 (1993),

*quoting New Orleans v. Dukes,* 427 U.S. 297, 303, 96 S.Ct. 2513, 2517, 49 L.Ed.2d 511 (1976) (*per curiam*).

■ The trial court also erroneously ruled that the Amendment did not rationally relate to any permissible public purpose. *Equality II,* 860 F.Supp. at 440–44. However, to the contrary, the Amendment potentially furthered a litany of valid community interests. It encouraged enhanced associational liberty on the part of Cincinnati residents respecting the sexual orientation issue by eliminating exposure to the punishment mandated by the Human Rights Ordinance against certain persons who elected to disassociate themselves from homosexuals. The Amendment repealed an official municipal policy judgment respecting homosexuality, erstwhile conveyed via the Human Rights Ordinance and the Equal Employment Opportunity Ordinance, thus returning the municipal government to a position of neutrality on the issue.[10] Additionally, the measure reduced governmental regulation of the private social and economic conduct of Cincinnati residents, and augmented the degree of personal autonomy and collective popular sovereignty legally permitted concerning deeply personal choices and beliefs which are necessarily imbued with questions of individual conscience, private religious convictions, and other profoundly personal and deeply fundamental moral issues. In turn, this public dichotomy decreased municipal supervision of private conduct, which necessarily may result in some cost savings for the City's taxpayers. These values, and others, were at least arguably advanced by the Amendment, and therefore, irrespective of this court's view of the desirability of the Amendment as a matter of public policy, this court cannot say that the Amendment was not rationally related to a legitimate state objective. Ac-

---

9. Indeed, in the referendum context, it is *impermissible* for the reviewing court to inquire into the possible actual motivations of the electorate in adopting the proposal. *Arthur,* 782 F.2d at 574; *Clarke v. City of Cincinnati,* 40 F.3d 807, 815 (6th Cir.1994), *cert. denied,* — U.S. —, 115 S.Ct. 1960, 131 L.Ed.2d 851 (1995). Instead, the court must consider all hypothetical justifications which potentially support the enactment. *Beach Communications, supra.*

10. Even if the Amendment is construed to reflect the majority's moral views respecting homosexuality, the Supreme Court has dictated such articulations to constitute a legitimate governmental interest. *Bowers,* 478 U.S. at 196, 106 S.Ct. at 2846 (a state criminal sodomy statute is justified as an expression of the belief of the electorate majority that homosexuality is immoral).

cordingly, it infringes no constitutionally protected right and may stand as enacted.

■ The lower court also invalidated the Amendment by theorizing that it was unconstitutionally vague, because it affected only special legal protection for "gays, lesbians, and bisexuals," whereas the Human Rights Ordinance had erstwhile protected *all* persons based upon their sexual orientation. The district court found that plaintiff H.O.M.E. and other private employers in the City were confronted by a hiring dilemma as a result of a purported ambiguity inherent in the Amendment. *Equality II*, 860 F.Supp. at 447–49. Initially, it is noted that plaintiff H.O.M.E. is without standing to assert its argument because it has suffered no actual or imminent injury by the implementation of the Amendment, nor do its assertions present a case in controversy. *See Allen v. Wright*, 468 U.S. 737, 750–51, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 473, 102 S.Ct. 752, 759, 70 L.Ed.2d 700 (1982). Rather, H.O.M.E. has merely asserted an abstract hypothetical scenario and conjectured that it was unable to determine if the employment of a homosexual, lesbian, or bisexual because of his or her sexual orientation would be civilly or criminally actionable under the Human Rights Ordinance as anti-heterosexual discrimination. Moreover, even if H.O.M.E. had standing below, the vagueness issue has been rendered moot by Council's March 8, 1995 amendment to the Human Rights Ordinance (per Ordinance No. 66–1995) which struck all references to "sexual orientation" from the legislation. At the present time, the City's municipal ordinances provide no protection against private discrimination to any citizen by reason of sexual orientation, irrespective of whether that orientation is heterosexual, homosexual, lesbian, or bisexual. *See, e.g., Mosley v. Hairston*, 920 F.2d 409, 414 (6th Cir.1990).

Accordingly, the judgment below in favor of the plaintiffs is hereby REVERSED, and the district court's permanent injunction against implementation and enforcement of Amendment XII is hereby VACATED. Be-

cause the plaintiffs are no longer the prevailing parties in this litigation, the lower court's award of costs (including attorneys' fees) in their favor and against the City is hereby VACATED in its entirety. *Lewis v. Continental Bank Corporation*, 494 U.S. 472, 483, 110 S.Ct. 1249, 1256, 108 L.Ed.2d 400 (1990); *Clark v. Township of Falls*, 890 F.2d 625, 626–28 (3rd Cir.1989). This cause is hereby REMANDED to the district court for entry of judgment in favor of the defendants, and for such further necessary and appropriate proceedings and orders as are consistent with this decision.