EQUALITY FOUNDATION OF GREATER CINCINNATI, INC.; Richard Buchanan; Chad Bush; Edwin Greene; Rita Mathis; Roger Asterino; H.O.M.E., Inc., Plaintiffs–Appellees,

v.

CITY. OF CINCINNATI (94–3973/4280), Defendant–Appellant,

Equal Rights, Not Special Rights; Mark Miller; Thomas E. Brinkman, Jr.; Albert Moore (94–3855), Intervening Defendants–Appellants.

Nos. 94–3855, 94–3973 and 94–4280.

United States Court of Appeals, Sixth Circuit.

Argued March 19, 1997.

Decided Oct. 23, 1997.

290

Alphonse A. Gerhardstein (argued and briefed), Laufman, Rauh & Gerhardstein, Cincinnati, OH, Patricia M. Logue (briefed), Chicago, IL, Suzanne B. Goldberg (briefed), LAMBDA Legal Defense & Education Fund, New York City, Scott T. Greenwood (briefed), Greenwood & Associates, Cincinnati, OH, for Equality Foundation of Greater Cincinnati, Inc. in Nos. 94–3855 and 94–3973.

Alphonse A. Gerhardstein (argued and briefed), Laufman, Rauh & Gerhardstein, Cincinnati, OH, Patricia M. Logue (briefed), Chicago, IL, Scott T. Greenwood (briefed), Greenwood & Associates, Cincinnati, OH, for Equality Foundation of Greater Cincinnati, Inc. in No. 94–4280.

Alphonse A. Gerhardstein (argued and briefed), Laufman, Rauh & Gerhardstein, Cincinnati, OH, Patricia M. Logue (briefed), Chicago, IL, Scott T. Greenwood (briefed), Greenwood & Associates, Cincinnati, OH, for Richard Buchanan, Chad Bush, Edwin Greene, Rita Mathis, Roger Asterino and H.O.M.E., Inc.

Karl P. Kadon, III (argued and briefed), City Solicitor's Office for the City of Cincinnati, Cincinnati, OH, for City of Cincinnati in No. 94–3855.

Karl P. Kadon, III (argued and briefed), Mark S. Yurick, City Solicitor's Office for the

City of Cincinnati, Cincinnati, OH, for City of Cincinnati in Nos. 94–3973 and 94–4280.

William L. McGrath (briefed), Shaw, Pittman, Potts & Trowbridge, Washington, DC, John J. Fossett, Fossett, Howe, Wessels & Ogle, Ft. Wright, KY, Robert K. Skolrood (briefed), National Legal Foundation, Virginia Beach, VA, Robert H. Bork (briefed), American Enterprise Institute for Public Research, Michael A. Carvin (argued and briefed), Cooper & Carvin, Washington, DC, for Equal Rights, Not Special Rights.

John J. Fossett, Fossett, Howe, Wessels & Ogle, Ft. Wright, KY, Robert H. Bork (briefed), American Enterprise Institute for Public Research, Michael A. Carvin (argued and briefed), Cooper & Carvin, Washington, DC, for Mark Miller, Thomas E. Brinkman, Jr. and Albert Moore.

Thomas W. Condit, Condit & Dressing, Cincinnati, OH, for The American Family Association of Ohio.

Robert E. Manley, Manley, Burke, Lipton & Cook, Cincinnati, OH, for Cincinnati Federation of Teachers, et al.

Alice L. Brown, Alan Jenkins, NAACP Legal Defense & Educational Fund, New York City, for NAACP Legal Defense and Educational Fund, Inc., et al.

Eric J. Graninger, Louisville, KY, for James E. Andrews.

Paul M. Smith, Jenner & Block, Washington, DC, for The American Psychological Association, et al.

Marianne Neal, Asst. Atty. General, Office of the Attorney General of Ohio, Columbus, OH, Richard A. Cordray (briefed), Grove City, OH, for Ohio Attorney General.

Melissa Wells–Petry (briefed), Law Offices of Melissa Wells–Petry, Washington, DC, for Family Research Council.

Before: KENNEDY, KRUPANSKY, and NORRIS, Circuit Judges.

KRUPANSKY, Circuit Judge.

This court previously disposed of this cause in *Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati* (*"Equality Foundation I"*), 54 F.3d 261 (6th Cir.1995), *vacated,* —— U.S. ——, 116 S.Ct. 2519, 135 L.Ed.2d 1044 (1996). It has been remanded for reconsideration by the United States Supreme Court consequent to its decision in *Romer v. Evans,* —— U.S. ——, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996).

In case numbers 94–3855/3973, defendant/appellant the City of Cincinnati ("the City"), and intervening defendants/appellants Equal Rights Not Special Rights ("ERNSR"), Mark Miller, Thomas E. Brinkman, Jr., and Albert Moore (collectively denominated "the defendants"), challenged the lower court's invalidation of an amendment to the City Charter of Cincinnati ("the Charter") for purported constitutional infirmities, and its permanent injunction restraining implementation of that measure. As a result of an initiative petition, the subject amendment had appeared on the November 2, 1993 local ballot as "Issue 3" and was enacted by 62% of the ballots cast, thereby becoming Article XII of the Charter (hereinafter "the Cincinnati Charter Amendment" or "Article XII"). Article XII read:

*NO SPECIAL CLASS STATUS MAY BE GRANTED BASED UPON SEXUAL ORIENTATION, CONDUCT OR RELATIONSHIPS.*

The City of Cincinnati and its various Boards and Commissions may not enact, adopt, enforce or administer any ordinance, regulation, rule or policy which provides that homosexual, lesbian, or bisexual orientation, status, conduct, or relationship constitutes, entitles, or otherwise provides a person with the basis to have any claim of minority or protected status, quota preference or other preferential treatment. This provision of the City Charter shall in all respects be self-executing. Any ordinance, regulation, rule or policy enacted before this amendment is adopted that violates the foregoing prohibition shall be null and void and of no force or effect.

Defendant ERNSR had drafted and initiated Issue 3 in response to the prior adoption by the Cincinnati City Council ("Council") of two city ordinances. On March 13, 1991,

Council enacted Ordinance No. 79–1991, commonly known as the "Equal Employment Opportunity Ordinance," which mandated that the City could not discriminate in its own hiring practices on the basis of

> classification factors such as race, color, sex, handicap, religion, national or ethnic origin, age, *sexual orientation,* HIV status, Appalachian regional ancestry, and marital status.

(Emphasis added).

Subsequently, Council on November 25, 1992 adopted Ordinance No. 490–1992 (commonly referred to as the "Human Rights Ordinance") which prohibited private discrimination in employment, housing, or public accommodation for reasons of sexual orientation. The opening paragraph of the Human Rights Ordinance expressed the intent of this legislation as:

> PROHIBITING unlawful discriminatory practices in the City of Cincinnati based on race, gender, age, color, religion, disability status, *sexual orientation,* marital status, or ethnic, national or Appalachian regional origin, in *employment, housing,* and *public accommodations* by ordaining Chapter 914, Cincinnati Municipal Code.

(Emphases added). The new law created a complaint and hearing procedure for seeking redress from purported sexual orientation discrimination, and exposed offenders to civil and criminal penalties.

In case number 94–4280, the City contested the district court's award of attorneys' fees and costs in favor of the plaintiffs/appellees Equality Foundation of Greater Cincinnati, Inc., Housing Opportunities Made Equal, Inc., Richard Buchanan, Chad Bush, Edwin Greene, Rita Mathis, and Roger Asterino (collectively designated "the plaintiffs") as the prevailing parties.

 On May 12, 1995, this reviewing court reversed the lower court's judgment, vacated its injunction, and vacated its award of costs and attorneys' fees to the plaintiffs, concluding that the Cincinnati Charter Amendment offended neither the First nor the Fourteenth Amendments to the United States Constitution and accordingly could stand as enacted by the Cincinnati voters. *Equality Foundation I,* 54 F.3d 261 (6th Cir.1995). Applying the Supreme Court's longstanding, traditional tripartite equal protection analysis, *see, e.g., City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254–55, 87 L.Ed.2d 313 (1985),[1] this court initially considered if the newly enacted Cincinnati Charter Amendment uniquely disabled any "suspect class" or "quasi-suspect class," or invaded any person's "fundamental right(s)." In so doing, it resolved that, under *Bowers v. Hardwick,* 478 U.S. 186, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (directing that homosexuals possessed no fundamental substantive due process right to engage in homosexual conduct or constitutional protection against criminalization of

---

1. Where a statute or ordinance uniquely and adversely impacts a "suspect class" such as one defined by race, alienage, or national origin, or invades a "fundamental right" such as speech or religious freedom, the rigorous "strict scrutiny" standard governs, whereby such laws "will be sustained only if they are suitably tailored to serve a compelling state interest." *City of Cleburne v. Cleburne Living Center,* 473 U.S. 432, 440, 105 S.Ct. 3249, 3254, 87 L.Ed.2d 313 (1985). Where legislation singularly and negatively affects a "quasi-suspect" class (*i.e.* one defined by gender or illegitimacy), a somewhat less stringent evaluative norm (sometimes called "intermediate scrutiny") controls whereby such a legislative classification is deemed valid if it is "substantially related to a sufficiently important governmental interest" (gender classifications) or is "substantially related to a legitimate state interest" (illegitimacy classifications). *Id.* at 440–41, 105 S.Ct. at 3254–55. However, an ordinary enactment, such as the local initiative in the instant case, which does not impair the interests of members of any suspect or quasi-suspect class, and does not inordinately burden the plaintiffs' exercise of any fundamental constitutional right, is tested under the least demanding equal protection standard, the "rational relationship" inquiry. Under this deferential evaluation, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* at 440, 105 S.Ct. at 3254. "When social or economic legislation is at issue, the Equal Protection Clause allows the States wide latitude, and the Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes." *Id.* at 440, 105 S.Ct. at 3254 (citations omitted). *See also 37712, Inc. v. Ohio Dept. of Liquor Control,* 113 F.3d 614, 621–22 (6th Cir.1997).

that activity) and its progeny,[2] homosexuals did not constitute either a "suspect class" or a "quasi-suspect class" because the conduct which defined them as homosexuals was constitutionally proscribable. *Equality Foundation I*, 54 F.3d at 266–67 & n. 2. This court further observed that any attempted identification of homosexuals by non-behavioral attributes could have no meaning, because the law could not successfully categorize persons "by subjective and unapparent characteristics such as innate desires, drives, and thoughts." *Id.* at 267. Additionally, this court denied the existence of any all-inclusive fundamental constitutional right to "participate fully in the political process" which could be impaired by the Cincinnati Charter Amendment,[3] and rejected the claim that the provision infringed anyone's fundamental First Amendment right to speak or associate freely, or to petition the government for redress of grievances. *Id.* at 268–70.

Accordingly, because the Cincinnati Charter Amendment targeted no suspect class or quasi-suspect class, and divested no one of any fundamental right, it was not subject to either form of heightened constitutional scrutiny (namely "strict scrutiny" or "intermediate scrutiny"). *See Cleburne*, 473 U.S. at 439–41, 105 S.Ct. at 3253–55. Rather, it should have been assessed under the most common and least rigorous equal protection norm (the "rational relationship" test), which directed that challenged legislation must stand if it rationally furthers any conceivable legitimate governmental interest.[4] *Heller v. Doe by Doe*, 509 U.S. 312, 319–21, 113 S.Ct. 2637, 2642–43, 125 L.Ed.2d 257 (1993); *Federal Communications Commission v. Beach Communications, Inc.*, 508 U.S. 307, 313–15, 113 S.Ct. 2096, 2100–02, 124 L.Ed.2d 211 (1993); *Cleburne, supra; see Equality Foundation I*, 54 F.3d at 270. In *Equality Foundation I*, this court observed that the Cincinnati Charter Amendment advanced a variety of valid community interests, including enhanced associational liberty for its citizenry,

---

**2.** *See Steffan v. Perry*, 41 F.3d 677, 684 n. 3 (D.C.Cir.1994) (en banc) (following *Padula v. Webster*, 822 F.2d 97, 103 (D.C.Cir.1987) ("It would be quite anomalous, on its face, to declare status defined by conduct that states may constitutionally criminalize as deserving of strict scrutiny under the equal protection clause")); *Ben–Shalom v. Marsh*, 881 F.2d 454, 464 (7th Cir. 1989), *cert. denied*, 494 U.S. 1004, 110 S.Ct. 1296, 108 L.Ed.2d 473 (1990) ("If homosexual conduct may constitutionally be criminalized, then homosexuals do not constitute a suspect or quasi-suspect class entitled to greater than rational basis scrutiny for equal protection purposes"); *High Tech Gays v. Defense Industrial Security Clearance Office*, 895 F.2d 563, 571 (9th Cir.1990) (same); *Woodward v. United States*, 871 F.2d 1068, 1076 (Fed.Cir.1989), *cert. denied*, 494 U.S. 1003, 110 S.Ct. 1295, 108 L.Ed.2d 473 (1990) (explaining that homosexuality is primarily behavioral in nature and as such is not immutable; "[a]fter *Hardwick* it cannot logically be asserted that discrimination against homosexuals is constitutionally infirm").

*Accord Baker v. Wade*, 769 F.2d 289, 292 (5th Cir.1985) (en banc), *cert. denied*, 478 U.S. 1022, 106 S.Ct. 3337, 92 L.Ed.2d 742 (1986) (pronouncing that homosexuals compose neither a suspect nor a quasi-suspect class); *National Gay Task Force v. Board of Education of Oklahoma City*, 729 F.2d 1270, 1273 (10th Cir.1984), *aff'd mem. by an equally divided Court*, 470 U.S. 903, 105 S.Ct. 1858, 84 L.Ed.2d 776 (1985) (resolving that the legal classification of gays is not suspect) (both decided prior to *Bowers* ).

**3.** By contrast, the district court had accepted the plaintiffs' argument that such a fundamental right emanated from the Constitution and that Article XII deprived Cincinnati gays of the exercise of that purported right. *See Equality Foundation I*, 54 F.3d at 268 (citing *Equality Foundation of Greater Cincinnati, Inc. v. City of Cincinnati*, 860 F.Supp. 417, 430–34 (S.D.Ohio 1994)).

**4.** The party challenging the rationality of legislation bears the burden of negating every conceivable basis for that enactment, regardless of whether or not such supporting rationale was cited by, or actually relied upon by, the promulgating authority. *Federal Communications Commission v. Beach Communications, Inc.*, 508 U.S. 307, 313–15, 113 S.Ct. 2096, 2100–02, 124 L.Ed.2d 211 (1993). "The burden upon a party seeking to overturn a legislative enactment for irrationally discriminating between groups under the equal protection clause is an extremely heavy one." *Borman's, Inc. v. Michigan Prop. & Cas. Guar. Ass'n*, 925 F.2d 160, 162 (6th Cir.), *cert. denied*, 502 U.S. 823, 112 S.Ct. 85, 116 L.Ed.2d 58 (1991).

Indeed, a reviewing court in this circuit may not even inquire into the electorate's possible actual motivations for adopting a measure via initiative or referendum. Instead, the court must consider all hypothetical justifications which potentially support the enactment. *Arthur v. City of Toledo*, 782 F.2d 565, 574 (6th Cir.1986); *Clarke v. City of Cincinnati*, 40 F.3d 807, 815 (6th Cir. 1994), *cert. denied*, 514 U.S. 1109, 115 S.Ct. 1960, 131 L.Ed.2d 851 (1995).

conservation of public resources, and augmentation of individual autonomy imbedded in personal conscience and morality. Thus, Article XII satisfied minimal constitutional requirements. *Equality Foundation I,* 54 F.3d at 270–71. Finally, this court rejected, on standing and mootness rationales, the plaintiffs' contention that the Cincinnati Charter Amendment was void for unconstitutional vagueness. *Id.* at 271.

On May 20, 1996, the United States Supreme Court decided *Romer v. Evans,* —— U.S. ——, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996). In that decision, the Court invalidated an amendment to the Colorado constitution ("Colorado Amendment 2") enacted by a statewide plebiscite as an infringement of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Colorado Amendment 2 recited:

> No Protected Status Based on Homosexual, Lesbian, or Bisexual Orientation. Neither the State of Colorado, through any of its branches or departments, nor any of its agencies, political subdivisions, municipalities or school districts, shall enact, adopt or enforce any statute, regulation, ordinance or policy whereby homosexual, lesbian or bisexual orientation, conduct, practices or relationships shall constitute or otherwise be the basis of or entitle any person or class of persons to have or claim any minority status, quota preferences, protected status or claim of discrimination. This Section of the Constitution shall be in all respects self-executing.

*Id.* at ——, 116 S.Ct. at 1623.

Although the United States Supreme Court in *Romer* affirmed the Colorado Supreme Court's decision striking down Colorado Amendment 2, it rejected the reasoning of that court which had posited the existence of a fundamental constitutional right to participate in the political process and then concluded that, under "strict scrutiny" review, Colorado Amendment 2 deprived homosexuals in Colorado of that fundamental right.

---

5. *See Valot v. Southeast Local School Dist. Bd. of Educ.,* 107 F.3d 1220, 1229 (6th Cir.1997) (ruling that government regulations which do not classify plaintiffs on suspect or quasi-suspect lines, nor impinge constitutionally protected personal

*Romer,* at ——, 116 S.Ct. at 1624 (*citing Evans v. Romer,* 854 P.2d 1270 (Colo.1993) and *Evans v. Romer,* 882 P.2d 1335 (Colo. 1994)). By contrast, the United States Supreme Court did not assess Colorado Amendment 2 under "strict scrutiny" or "intermediate scrutiny" standards, but instead ultimately applied "rational relationship" strictures to that enactment and resolved that the Colorado state constitutional provision did not invade any fundamental right and did not target any suspect class or quasi-suspect class. *See Romer,* at ——, 116 S.Ct. at 1627. In so ruling, the Court, *inter alia,* (1) reconfirmed the traditional tripartite equal protection assessment of legislative measures;[5] and (2) resolved that the deferential "rational relationship" test, that declared the constitutional validity of a statute or ordinance if it rationally furthered any conceivable valid public interest, was the correct point of departure for the evaluation of laws which uniquely burdened the interests of homosexuals.

Nonetheless, the *Romer* Court invalidated Colorado Amendment 2 because it was deemed invidiously discriminatory and not rationally connected to the advancement of any legitimate state objective. *Romer,* at ——, ——, 116 S.Ct. at 1627, 1629. Subsequently, on June 17, 1996, the Supreme Court granted the plaintiffs' petition for a writ of certiorari in the case *sub judice,* vacated this court's judgment in *Equality Foundation I,* and remanded the cause to this forum "for further consideration in light of *Romer v. Evans,* 517 U.S. ——, 116 S.Ct. 1620, 134 L.Ed.2d 855 (1996)." *Equality Foundation of Greater Cincinnati v. City of Cincinnati,* —— U.S. ——, 116 S.Ct. 2519, 135 L.Ed.2d 1044 (1996). Upon remand, this court ordered rebriefing by the parties and full rehearing (conducted on March 19, 1997).

Although this circuit, in *Equality Foundation I,* and the Supreme Court, in *Romer,* each applied "rational relationship" scrutiny to a popularly enacted measure which negatively impacted the interests of homosexuals,

---

rights, are reviewed for rationality) (*citing Romer,* at ——, 116 S.Ct. at 1627), *petition for cert. filed,* 66 U.S.L.W. 3086 (July 10, 1997) (No. 97–74).

this court concluded that the Cincinnati Charter Amendment withstood a constitutional equal protection·· attack, whereas the Supreme Court resolved that Colorado Amendment 2 did not. An exacting comparative analysis of *Romer* with the facts and circumstances of this case disclose that these contrary results were reached because the two cases involved substantially ·different enactments of entirely distinct scope and impact, which conceptually and analytically distinguished the constitutional posture of the two measures. As developed herein, the salient operative factors which motivated the *Romer* analysis and result were unique to that case and were not implicated in *Equality Foundation I.*

The *Romer* Court, prior to undertaking the conventional "rational relationship" equal protection inquiry, initially characterized Colorado Amendment 2 as facially objectionable because it removed municipally legislated special legal protection from gays and· precluded the relegislation of special legal rights for them at every level of state government:

> Amendment 2, in explicit terms, does more than repeal or rescind these provisions [city ordinances banning gay discrimination in housing, public accommodations, employment, ·education, and health and welfare services]. It prohibits all legislative, executive or judicial action at any level of state or local government designed to protect the named class, a class we shall refer to as homosexual persons or gays and lesbians.

*Romer,* at ——, 116 S.Ct. at 1623. The Court elaborated:

> Sweeping and comprehensive is the change in legal status effected by this law.... Homosexuals, by state decree, are put in a solitary class with respect to transactions and relations in both the private and the governmental spheres. The amendment withdraws from homosexuals, but no others, specific legal protection from the injuries caused by discrimination, and it forbids reinstatement of these laws and policies.

*Id.* at ——, 116 S.Ct. at 1625.

The majority concluded:

In any event, even if, as we doubt, homosexuals could find some safe harbor in laws of general application, we cannot accept the view that Amendment 2's prohibition on specific legal protections does no more than deprive homosexuals of special rights. To the contrary, the amendment imposes a special disability upon those persons alone. Homosexuals are forbidden the safeguards that others enjoy or may seek without constraint. They can obtain specific protection against discrimination only by enlisting.the citizenry· of Colorado to amend the state constitution or perhaps, on [sic] the. State's view, by trying to pass helpful laws of general applicability. This is so no matter how local or discrete the harm, no · matter how public or widespread the injury. We find nothing special in the protections Amendment 2 withholds. These are protections taken for granted by most people either because they already have them or do not need them; these are protections against exclusion from an almost limitless number öf transactions and endeavors that constitute ordinary civic life in a free society.

*Id.* at ——, 116 S.Ct. at 1626–27.

The Court additionally observed that Colorado Amendment 2 could be read to divest homosexuals of all state law government protection available to all other citizens:

> Amendment 2's reach may not be limited to specific laws passed for the benefit of gays and lesbians. It is a fair, if not necessary, inference from the broad language of the .amendment that it deprives gays and lesbians even of the protection of general laws and policies that prohibit arbitrary discrimination in governmental and private settings.

*Romer,* at ——, 116 S.Ct. at 1626. However, the *Romer* Court ·did not rely upon that potential universally.exclusive effect to invalidate the measure, but instead ultimately construed Colorado 'Amendment 2 only to remove and prohibit special legal rights for homosexuals under state law:

> If this consequence [withdrawal of all state law rights from homosexuals] follows from Amendment 2, as its broad language suggests, it would compound the constitu-

tional difficulties the law creates. The state court did not decide whether the amendment had this effect, however, and neither do we.[6]

*Id.*

The more restricted reach of the Cincinnati Charter Amendment, as compared to the actual and potential sweep of Colorado Amendment 2, is noteworthy. Colorado's Amendment 2 provided:

> **No Protected Status** Based on Homosexual, Lesbian, or Bisexual Orientation. Neither the State of Colorado, through any of its branches or departments, nor any of its agencies, political subdivisions, municipalities or school districts, shall enact, adopt or enforce any statute, regulation, ordinance or policy whereby homosexual, lesbian or bisexual orientation, conduct, practices or relationships shall constitute or otherwise be the basis of or entitle any person or class of persons to have or claim **any** minority status, quota preferences, **protected status** or **claim of discrimination**. This Section of the Constitution shall be in all respects self-executing.

*Romer*, at ——, 116 S.Ct. at 1623 (boldface added). By contrast, Cincinnati's Article XII pronounced:

> *NO SPECIAL CLASS STATUS MAY BE GRANTED BASED UPON SEXUAL ORIENTATION, CONDUCT OR RELATIONSHIPS.*
>
> The City of Cincinnati and its various Boards and Commissions may not enact, adopt, enforce or administer any ordinance, regulation, rule or policy which provides that homosexual, lesbian, or bisexual orientation, status, conduct, or relationship constitutes, entitles, or otherwise provides

a person with the basis to have any claim of minority or protected status, quota preference **or other preferential treatment**. This provision of the City Charter shall in all respects be self-executing. Any ordinance, regulation, rule or policy enacted before this amendment is adopted that violates the foregoing prohibition shall be null and void and of no force or effect.

*Equality Foundation I,* 54 F.3d at 264 (boldface added).

▮▮▮ Accordingly, the language of the Cincinnati Charter Amendment, read in its full context, merely prevented homosexuals, as homosexuals, from obtaining special privileges and preferences (such as affirmative action preferences or the legally sanctioned power to force employers, landlords, and merchants to transact business with them) from the City. In stark contrast, Colorado Amendment 2's far broader language could be construed to exclude homosexuals from the protection of every Colorado state law, including laws generally applicable to all other Coloradans, thus rendering gay people without recourse to any state authority at any level of government for any type of victimization or abuse which they might suffer by either private or public actors. *Romer,* at —— – ——, 116 S.Ct. at 1625–27. Whereas Colorado Amendment 2 ominously threatened to reduce an entire segment of the state's population to the status of virtual non-citizens (or even non-persons) without legal rights under any and every type of state law,[7] the Cincinnati Charter Amendment had no such sweeping and conscience-shocking effect, because (1) it applied only at the lowest (municipal) level of government and thus could not dispossess gay Cincinnati-

---

**6.** Concordantly, the three dissenting Justices accepted the majority rationale that Colorado Amendment 2 did not divest homosexuals of the rights and protections available to other Coloradans under state laws of general application, and observed that it merely erected a barrier to the enactment of special legal rights for gay Coloradans at all levels of state law:

> [T]he Court's [majority] opinion ultimately does not dispute [that the amendment does not deprive gays of state law rights generally applicable to all other persons in Colorado], but assumed it to be true. See *ante,* at ——, 116 S.Ct. at 1626. The only denial of equal treatment it contends homosexuals have suffered is

this: They may not obtain *preferential* treatment without amending the state constitution. *Romer,* at ——, 116 S.Ct. at 1630 (Scalia, J., dissenting) (emphasis in original).

**7.** The *Romer* Court opined:

> We must conclude that Amendment 2 classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else. This Colorado cannot do. A State cannot deem a class of persons a stranger to its laws.
> *Romer,* at ——, 116 S.Ct. at 1629.

ans of any rights derived from any higher level of state law and enforced by a superior apparatus of state government, and (2) its narrow, restrictive language could not be construed to deprive homosexuals of all legal protections even under municipal law, but instead eliminated only "special class status" and "preferential treatment" for gays as gays under Cincinnati ordinances and policies, leaving untouched the application, to gay citizens, of any and all legal rights generally accorded by the municipal government to all persons as persons.[8]

At bottom, the Supreme Court in *Romer* found that a state constitutional proviso which deprived a politically unpopular minority, but no others, of the political ability to obtain special legislation at every level of state government, including within local jurisdictions having pro-gay rights majorities, with the only possible recourse available through surmounting the formidable political obstacle of securing a rescinding amendment to the state constitution, was simply so obviously and fundamentally inequitable, arbitrary, and oppressive that it literally violated basic equal protection values. Thus, the Supreme Court directed that the ordinary three-part equal protection query was rendered irrelevant. *See Romer*, at ——, 116 S.Ct. at 1627 (noting that Colorado Amendment 2 "defies" conventional equal protection analysis).

This "extra-conventional" application of equal protection principles can have no pertinence to the case *sub judice*. The low level of government at which Article XII becomes operative is significant because the opponents of that strictly local enactment need not undertake the monumental political task of procuring an amendment to the Ohio Constitution as a precondition to achievement of a desired change in the local law, but instead may either seek local repeal of the subject amendment through ordinary municipal political processes, or pursue relief from every higher level of Ohio government including but not limited to Hamilton County, state agencies, the Ohio legislature, or the voters themselves via a statewide initiative.

Moreover, unlike Colorado Amendment 2, which interfered with the expression of local community preferences in that state, the Cincinnati Charter Amendment constituted a direct expression of the local community will on a subject of direct consequences to the voters. Patently, a local measure adopted by direct franchise, designed in part to preserve community values and character, which does not impinge upon any fundamental right or the interests of any suspect or quasi-suspect class, carries a formidable presumption of legitimacy and is thus entitled to the highest degree of deference from the courts. *Cf. Hunter v. Erickson*, 393 U.S. 385, 89 S.Ct. 557, 21 L.Ed.2d 616 (1969) (commanding that a municipal charter amendment adopted by initiative cannot stand if it facially discriminates along suspect lines of race, color, religion, and national origin); *James v. Valtierra*, 402 U.S. 137, 140–41, 91 S.Ct. 1331, 1333–34, 28 L.Ed.2d 678 (1971).

As the product of direct legislation by the people, a popularly enacted initiative or referendum occupies a special posture in this nation's constitutional tradition and jurisprudence. An expression of the popular will expressed by majority plebiscite, especially at the lowest level of government (which is the level of government closest to the people), must not be cavalierly disregarded. *See, e.g., City of Eastlake v. Forest City Enterprises, Inc.*, 426 U.S. 668, 679, 96 S.Ct. 2358, 2364–65, 49 L.Ed.2d 132 (1976) (ex-

---

8. The City was not constitutionally compelled to enact special privileges or protections for homosexuals because no person is constitutionally insulated from private discrimination, *Crawford v. Board of Education*, 458 U.S. 527, 538, 102 S.Ct. 3211, 3218, 73 L.Ed.2d 948 (1982); *Moose Lodge No. 107 v. Irvis*, 407 U.S. 163, 172, 92 S.Ct. 1965, 1971, 32 L.Ed.2d 627 (1972), and because public discrimination towards persons who are not members of a suspect or quasi-suspect class is permissible as long as such official discrimination is rationally linked to the furtherance of some valid public interest, *see Romer*, at ——, 116 S.Ct. at 1627. Nothing in *Romer* implied that the Colorado municipalities which had adopted gay rights ordinances could be constitutionally restrained from retracting such enactments through ordinary legislative processes. Indeed, the plaintiffs herein have conceded that the City and its voters at all times possessed the constitutional authority to rescind the gay rights ordinances. Accordingly, the Cincinnati City Charter's removal of previously enacted special rights for gays was constitutionally unassailable.

plaining that the referendum process is "a basic instrument of democratic government"); *James,* 402 U.S. at 141–43, 91 S.Ct. at 1333–34 (exalting the referendum as manifesting "devotion to democracy, not to bias, discrimination, or prejudice" and as constituting a "procedure [which] ensures that all the people of a community will have a voice in a decision . . . that will affect the future development of their own community."); *accord Southern Alameda Spanish Speaking Organization v. Union City,* 424 F.2d 291, 294 (9th Cir.1970) ("A referendum . . . is far more than an expression of ambiguously founded neighborhood preference. It is the city itself legislating through its voters—an exercise by the voters of their traditional right through direct legislation to override the views of their elected representatives as to what serves the public interest.") (*citing Spaulding v. Blair,* 403 F.2d 862, 863 (4th Cir.1968) ("The referendum procedure . . . is a fundamental part of the State's legislative process.")).[9]

In any event, *Romer* should not be construed to forbid local electorates the authority, via initiative, to instruct their elected city council representatives, or their elected or appointed municipal officers, to withhold special rights, privileges, and protections from homosexuals, or to prospectively remove the authority of such public representatives and officers to accord special rights, privileges, and protections to any non-suspect and non-quasi-suspect group. Such a reading would disenfranchise the voters of their most fundamental right which is the very foundation of the democratic form of government, even through the lowest (and most populist) organs and avenues of state government, to vote to override or preempt any policy or practice implemented or contemplated by their subordinate civil servants to bestow special rights, protections, and/or privileges upon a group of people who do not comprise a suspect or a quasi-suspect class and hence are not constitutionally entitled to any special favorable legal status. *Romer* dealt with a statewide constitutional amendment that denied homosexuals access to every level and instrumentality of state government as possible sources of special legal protection. *Romer* supplied no rationale for subjecting a purely local measure of modest scope, which simply refused special privileges under local law for a non-suspect and non-quasi-suspect group of citizens, to any equal protection

9. This court underscores that the constitutional concerns which anchor *Romer* are not implicated when previously adopted special legal protection at the local level is rescinded, and its reinstatement precluded, irrespective of whether the prohibition is enacted by the voters directly, by the city's elected representatives, or by some other competent instrumentality such as a local department supervisor. Unlike a state government, which is composed of discrete and quasi-independent levels and entities such as cities, counties, and the general state government, a municipality is a unitary local political subdivision or unit comprised, fundamentally, of the territory and residents within its geographical boundaries. *See, e.g., Mumford v. Basinski,* 105 F.3d 264, 267–68 (6th Cir.1997) (distinguishing Ohio municipalities and counties as creatures of state law constituting "bodies politic and corporate" from the state government and its arms, officers, and instrumentalities), *petition for cert. filed,* 66 U.S.L.W. 3137 (U.S. Aug. 4, 1997) (No. 97–243). The citizens of the City of Cincinnati have instituted a charter form of government whereby day to day management is delegated to an elected city council, which in turn delegates specific tasks to various departments and agents. But the citizenry as a whole remains the ultimate authority in this discrete political subdivision, and it can, by charter amendment, alter the authority and powers it delegated to its council.

No logically sound construction of the components of a municipal polity could compartmentalize the City's citizens, elected representatives, and administrative departments into conceptually separate levels of local government, in the way that municipalities and other local entities are distinct levels of state government as compared to the state entity itself. Hence, it would be irrational to argue that the adoption of a gay rights regulation by a municipal department could not constitutionally be eliminated, and its reintroduction barred, by the city council or the city's voters, on the theory that it would be more difficult for proponents of gay rights to lobby the city council or the city's electorate than to lobby the pertinent department chief, because the city's voters, elected council, and departments and employees are all components, with varying degrees and spheres of authority, of the same (municipal) level of state government. Stated differently, it would be illogical to conclude that city council would be powerless to void a rule or regulation promulgated by one of the city's departments or department heads on the theory that it would be more difficult to lobby council for a change than the department administrators.

assessment other than the traditional "rational relationship" test.

The *Romer* Court, after concluding that the sweeping effect of Colorado Amendment 2 literally offended basic equal protection standards without the necessity of performing the traditional three-tiered equal protection analysis, then mandated that, even under traditional equal protection strictures, Colorado Amendment 2 could not survive "rational relationship" review:

> Amendment 2 fails, indeed defies, even this conventional inquiry. First, the amendment has the peculiar property of imposing a broad and undifferentiated disability on a single named group, an exceptional and, as we shall explain, invalid form of legislation. Second, its sheer breadth is so discontinuous with the reasons offered for it that the amendment seems inexplicable by anything but animus toward the class that it affects; it lacks a rational relationship to legitimate state interests.
>
> . . . .
>
> In the ordinary case, a law will be sustained if it can be said to advance a legitimate government interest, even if the law seems unwise or works to the disadvantage of a particular group, or if the rationale for it seems tenuous.... By requiring that the classifications bear a rational relationship to an independent and legitimate legislative end, we ensure that classifications are not drawn for the purpose of disadvantaging the group burdened by the law.
>
> Amendment 2 confounds this normal process of judicial review. It is at once too narrow and too broad. It identifies persons by a single trait and then denies them protection across the board. The resulting disqualification of a class of persons from the right to seek specific protection for the law is unprecedented in our jurisprudence.

*Id.* at ——–——, 116 S.Ct. at 1627–28 (citations omitted).

Accordingly, the *Romer* majority's rejection of rational relationship assessment hinged upon the wide breadth of Colorado Amendment 2, which deprived a politically unpopular minority of the opportunity to secure special rights at every level of state law. The uniqueness of Colorado Amendment 2's sweeping scope and effect differentiated it from the "ordinary case" in which a law adversely affects a discernable group in a relatively discrete manner and limited degree. In this context, the Court found that the rationales proffered by the state in support of Colorado Amendment 2 could not be justified, because the scope and effect of Colorado Amendment 2 "raise the inevitable inference that the disadvantage imposed is born of animosity toward the class of persons affected." *Id.* at ——, 116 S.Ct. at 1628. Therefore, the *Romer* Court rejected the state's argument that Colorado Amendment 2, as drafted, rationally advanced its legitimate public interests in furthering "respect for other citizens' freedom of association, and in particular of landlords or employers who have personal or religious objections to homosexuality" and "conserving resources to fight discrimination against other groups." *Id.* at ——, 116 S.Ct. at 1629. The Court found:

> The breadth of the Amendment is so far removed from these particular justifications that we find it impossible to credit them. We cannot say that Amendment 2 is directed to any identifiable legitimate purpose or discrete objective.[10]

*Id.*

In essence, the high Court resolved that a state constitutional amendment which denied homosexuals any opportunity to attain state law protection, even from municipalities or other local entities within that state which desired to accord them special legal rights, could not be justified by the proffered public interests purportedly advanced by that state enactment, namely enhancement of the associational liberty of the state's residents and the conservation of public resources, because the citizens of the affected subordinate bodies politic had elected, or otherwise would elect, to forgo those identified public inter-

---

**10.** *See also id.* at ——–——, 116 S.Ct. at 1628–29 (noting that by removing all access to special state legal protection from gays, Colorado Amendment 2 "inflicts on them immediate, continuing, and real injuries that outrun and belie any legitimate justifications that may be claimed for it").

ests in favor of guaranteeing, through local governmental instrumentalities, nondiscriminatory treatment of the gay citizens of their local governmental units.

A state law which prevents local voters or their representatives, against their will, from granting special rights to gays, cannot be rationally justified by cost savings and associational liberties which the majority of citizens in those communities do not want. Clearly, the financial interests and associational liberties of the citizens of the state as a whole are not implicated if a municipality creates special legal protections for homosexuals applicable only within that jurisdiction and implements those protections solely via local governmental apparatuses. For this reason, the justifications proffered by Colorado for Colorado Amendment 2 insufficiently supported that provision, and implied that no reason other than a bare desire to harm homosexuals, rather than to advance the individual and collective interests of the majority of Colorado's citizens, motivated the state's voters to adopt Colorado Amendment 2.[11]

In contradistinction, as evolved herein, the Cincinnati Charter Amendment constituted local legislation of purely local scope. As such, the City's voters had clear, actual, and direct individual and collective interests in that measure, and in the potential cost savings and other contingent benefits which could result from that local law. Beyond contradiction, passage of the Cincinnati Charter Amendment was not facially animated solely by an impermissible naked desire of a majority of the City's residents to injure an unpopular group of citizens, rather than to legally actualize their individual and collective interests and preferences. Clearly, the Cincinnati Charter Amendment implicated at least one issue of direct, actual, and practical importance to those who voted it into law, namely whether those voters would be legally compelled by municipal ordinances to expend their own public and private resources to guarantee and enforce nondiscrimination against gays in local commercial transactions and social intercourse.

■ Unquestionably, the Cincinnati Charter Amendment's removal of homosexuals from the ranks of persons protected by municipal antidiscrimination ordinances, and its preclusion of restoring that group to protected status, would eliminate and forestall the substantial public costs that accrue from the investigation and adjudication of sexual orientation discrimination complaints, which costs the City alone would otherwise bear because no coextensive protection exists under federal or state law. Moreover, the elimination of actionable special rights extended by city ordinances, and prevention of the reinstatement of such ordinances, would effectively advance the legitimate governmental interest of reducing the exposure of the City's residents to protracted and costly litigation by eliminating a municipally-created class of legal claims and charges, thus necessarily saving the City and its citizens, including property owners and employers, the costs of defending against such actions.[12] Although the *Romer* Court never rejected associational liberty and the expression of community moral disapproval of homosexuality as rational bases supporting an enact-

---

11. The *Romer* Court opined that, because Colorado Amendment 2 prevented even localities solicitous of homosexual rights from enacting legal assistance for homosexuals, the true objective of that measure was to maliciously injure homosexuals rather than to advance a proper interest of a majority of the state's voters:

> We must conclude that Amendment 2 classifies homosexuals not to further a proper legislative end but to make them unequal to everyone else. This Colorado cannot do. A State cannot deem a class of persons a stranger to its laws.

*Romer*, at ——, 116 S.Ct. at 1629.

12. Indeed, the United States Senate last year considered legislation crafted to eliminate sexual orientation discrimination in employment, but rejected that proposal largely to avoid promotion of a "litigation bonanza." 142 Cong. Rec S9992 (daily ed. Sept. 6, 1996) (statement of Sen. Hatch) (commenting on Employment Nondiscrimination Act of 1995, S.2056, 104th Cong.). *See also id.* at S10004 ("The bill virtually guarantees an avalanche of costly litigation which could hurt small businesses most of all.") (statement of Sen. Coverdell); *id.* at S9997 ("A lot of individuals and a lot of firms would be sued based on sexual orientation claims if this bill becomes law.") (statement of Sen. Nickles); *id.* at S9989 ("I do not believe ... that we will promote greater tolerance in the workplace by relying on more lawsuits as this bill would require.") (statement of Sen. Kassebaum).

ment denying privileged treatment to homosexuals, it concluded that under the facts and circumstances of *Romer*, the state's argument in support of Colorado Amendment 2 was not credible. Because the valid interests of the Cincinnati electorate in conserving public and private financial resources is, standing alone, of sufficient weight to justify the City's Charter Amendment under a rational basis analysis, discussion of equally justifiable community interests, including the application of associational liberty and community moral disapproval of homosexuality, is unnecessary to sustain the Charter Amendment's viability.[13]

In summary, the Cincinnati Charter Amendment did not disempower a group of citizens from attaining special protection at all levels of state government, but instead merely removed municipally enacted special protection from gays and lesbians. Unlike Colorado Amendment 2, the Cincinnati Charter Amendment cannot be characterized as an irrational measure fashioned only to harm an unpopular segment of the population in a sweeping and unjustifiable manner.

Accordingly, the judgment below is hereby **REVERSED,** and the district court's permanent injunction against implementation and enforcement of the Cincinnati Charter Amendment (Article XII) is hereby **VACATED.** The lower court's award of costs (including attorneys' fees) to the plaintiffs is also **VACATED.** This case is hereby **REMANDED** to the district court for entry of judgment in favor of the defendants, and for such further necessary and appropriate proceedings and orders as are consistent with this decision.

---

13. Although Cincinnati's interest in conserving public and private resources might have been served by a mere repeal of the sexual orientation clauses of the Human Rights Ordinance and Equal Employment Opportunity Ordinance, we do not think it irrational for Cincinnati to advance this interest by means of a charter amendment. Cincinnati voters may have doubted that the city council would exercise the fiscal restraint the voters themselves valued, and they may, therefore, have feared that the Council would respond to a simple repeal by reenacting the two sexual orientation clauses. We conclude that the voters of Cincinnati were within their constitutional rights to declare that, henceforth, they alone would decide whether the benefits of protecting gays and lesbians from discrimination outweighs the costs.